James Larry McGLOTHLIN, Appellant,

v.

The STATE of Texas, State.

No. 2–84–276–CR.

Court of Appeals of Texas, Fort Worth.

March 13, 1986.

Danny D. Burns, Fort Worth, for appellant.

Jack A. McGaughey, Dist. Atty., Montague, for the State.

Before JOE SPURLOCK, II, HOPKINS and HUGHES (Retired), JJ.

## OPINION

JOE SPURLOCK, II, Justice.

Appellant, James Larry McGlothlin, was convicted by a jury of possession of amphetamine over 400 grams under the Texas Controlled Substances Act, TEX.REV.CIV. STAT.ANN. art. 4476–15, sec. 4.042(d)(2) (Vernon Supp.1986), and was sentenced to 25 years confinement. He brings thirteen grounds of error, complaining generally of an illegal search and seizure, violation of

the Speedy Trial Act, TEX.CODE CRIM. PROC.ANN. art. 32A.02 (Vernon Supp. 1986), insufficient evidence to support the jury verdict, error in the jury charge, jury misconduct and prosecutorial misconduct.

We affirm.

In ground of error one, appellant alleges the trial court committed reversible error in not granting appellant's motion to suppress evidence as it is clear from the record the search and arrest were instigated prior to the issuance of the search warrant.

■ It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable, subject only to a few specifically established and well-delineated exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). However, where officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its contents and take them into custody and secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable searches. *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 3382–83, 82 L.Ed.2d 599 (1984).

During the hearing on appellant's motion to suppress, Officer John Byork of the Texas Department of Public Safety testified as to the events leading up to the search of appellant's residence on the night in question. He testified that at the request of the chief of police, he and another officer proceeded to appellant's residence for the purpose of helping execute a search warrant that was forthcoming. The officers did not have a warrant in hand at the time they met other officers at appellant's door around 11:30 or 11:35 p.m. that night. While approaching the other officers at the front porch, Officer Byork overheard Sergeant Boykin telling appellant that "the warrant would soon be there, and that we would have to wait on the warrant, and we would just wait outside." Officer Byork then heard appellant say: "Let's go inside and sit down and wait where it is warm." The officers thereupon entered the residence and waited inside for the warrant to arrive. Officer Byork testified that no search was conducted until the search warrant arrived. (The record reflects that the warrant was signed at 11:44 p.m.) Officer Byork testified he and the other officers had waited inside appellant's residence "[m]aybe 15 or 20 minutes; 25 minutes at the most," before the search warrant arrived. He further testified that appellant was not under arrest and was free to leave during that time. The officers' purpose, he testified, was to "wait for a warrant with the possibility of him [appellant] maybe destroying any possible evidence that we might find."

Appellant testified for the limited purpose of the hearing on his motion to suppress. He related that, on the night in question, police officers arrived at his residence at an unknown time and told him that they had been instructed to hold him there until others arrived with a search warrant, and that he should step outside. Appellant then stepped outside and waited. After waiting awhile he told the officers he was cold and wanted to go inside. Appellant testified that he did not actually ask the officers to go inside, but that instead, they told him they would have to go inside with him. Appellant testified that, inside, the officers were "just looking, observing; checking everything out." He admitted on cross-examination that the officers did not conduct a physical search of the rooms.

■ While there is some conflicting evidence as to whether appellant invited the officers inside, such consent was not necessary in light of the undisputed evidence that the officers did not conduct a physical search of the premises. The evidence shows the officers went inside merely to prevent evidence from being destroyed, for a short period of time, and with a good faith belief that a warrant was being obtained. Although appellant was restrained in his movements, and technically under arrest, we find that no search was

instigated prior to the issuance of the search warrant, and for the reasons stated, overrule appellant's first ground of error. *See Segura,* 104 S.Ct. at 3382.

Appellant complains in grounds of error two and three that the trial court committed reversible error in overruling his motion to suppress as the search warrant exceeded the scope of the affidavit and that the description of the house was obviously supplied by the affiant, as opposed to the informant.

 The purpose of a search warrant is two-fold: to assure that there is adequate probable cause to search and to prevent the mistaken execution of the warrant against an innocent third party. *Bridges v. State,* 574 S.W.2d 560, 562 (Tex.Crim.App. 1978). *See* TEX.CODE CRIM.PROC.ANN. art. 18.01 (Vernon Supp.1986). The description of the place to be searched in the affidavit limits and controls the description in the search warrant. *Cantu v. State,* 557 S.W.2d 107, 108 (Tex.Crim.App.1977). The requirement that a search warrant be specific prohibits general searches and prevents the vesting of complete discretion in the officer who executes that warrant. *Chambers v. State,* 508 S.W.2d 348, 352 (Tex.Crim.App.1974).

The affidavit in support of the search warrant in this case stated as follows:

5. AFFIANT HAS PROBABLE CAUSE FOR SAID BELIEF BY REASON OF THE FOLLOWING FACTS: Affiant is Jim Wade, Chief of Police of the Bowie Police Dept. in Bowie, Texas. On November 30, 1983, a statement was made to me by a person known to me as Merilyn McGlothlin that her husband, James Larry McGlothlin was of her personal knowledge and observation, on the same date "cooking" a large quantity of Amphetamine at their home just outside the city of Bowie, Texas, which home is described in Exhibit "A" attached hereto. From surveillance of the premises so described, I know that the said premises are, in fact, used and occupied by James and Merilyn McGlothlin as their habitation. At the time that Merilyn McGlothlin made this statement she appeared to be under the influence of a drug other than alcohol, and her symptoms were consistent with those of a person under the influence of amphetamine. Further, a short time later on the same date, I observed James Larry McGlothlin at close hand and smelled an oder [sic] on his clothing consistent with that of chemicals used in the manufacture of amphetamine. Affiant has had experience as a peace officer in the identification of amphetamine in known samples and is familiar with its characteristics, manufacture and effects. Further, your affiant has, within the past 60 days, assisted in the incarceration [of] James Larry McGlothlin at a time when a large quantity of amphetamine was seized from his possession, the quantity later verified by lab analysis. Within that same period, instruments and chemicals for the manufacture of amphetamine were also seized from other premises occupied by James Larry McGlothlin[.]

WHEREFORE, Affiant asks for issuance of a warrant that will authorize him to search said suspected place and premises for said property and seize the same and to arrest each said described and accused person.

/s/ J.L. Wade
AFFIANT

SUBSCRIBED AND SWORN to before me by the said Affiant on this the 30th day of November 1983.

/s/ Olie Carriker
MAGISTRATE, MONTAGUE COUNTY, TEXAS

EXHIBIT "A"

Being a white frame singe [sic] family dwelling with composition roof and ½ brick trim in front, facing east on the west side of the upper Montague Road, at a location ³/₁₀ miles north of State Hwy. 1758, together with a two-car built-in carport on the north end of the house and a wood barn in the back of the house, the ambit of this description to

include all other structures, vehicles and places on the premises. The location of the premises may be further assertained [sic] by the fact that a yellow Camero [sic] convertible automobile is parked in the driveway of the house.

Upon execution of the warrant, the officers discovered the contraband in a barn or shed some 100 yards from the house. Officer Boykin testified that he and the other officers were "doing an over-all search of the whole premises; the barns, the ground, the whole premises."

■ Appellant argues that the affidavit clearly requests authority to conduct a general search, bridled only by the discretion of the officers executing the warrant. We disagree. The affidavit and the exhibit incorporated therein specifically describe the permissible boundaries of the search. Further, said premises were surrounded by a fence.

■ In *Cantu v. State*, the search of a chicken coop some 125 feet away from the residence was held valid. The court based its holding on a finding that the chicken coop was within the curtilage of the residence to be searched. *Cantu*, 557 S.W.2d at 109–10. The court defined "curtilage" as:

> 'The inclosed space immediately surrounding a dwelling house, contained within the same inclosure.... It has also been defined as "a fence or inclosure of a small piece of land around a dwelling house, usually including the buildings occupied in connection with the dwelling house, the inclosure consisting either of a separate fence, or partly of a fence and partly of the exterior of buildings so within this inclosure." '

*Id. Also see Kann v. State*, 694 S.W.2d 156, 159 (Tex.App.—Dallas 1985, pet. pending) (carport adjacent to backyard part of curtilage). We hold that the barn searched in this case was within the curtilage of appellant's residence.

■ Appellant also argues that the specific description of the property contained in Exhibit A was supplied by the affiant Officer Wade, and not by the informant, Merilyn McGlothlin. Appellant cites no authority in support of this contention, and we find none. Officer Wade swore that the affidavit was based upon a statement given to him by the informant, of her personal knowledge and observation. The magistrate could have reasonably inferred that the specific description of the premises attached as Exhibit A was based upon either the affiant's personal knowledge or upon the informant's statement. *See Gish v. State*, 606 S.W.2d 883, 886 (Tex.Crim.App. 1980); *Vessels v. State*, 467 S.W.2d 259, 262 (Tex.Crim.App.1971). Appellant's second and third grounds of error are overruled.

In his grounds of error nine, ten and eleven, appellant complains the trial court committed reversible error in not granting his motion to suppress evidence as, (9) the informant was obviously not a reliable and credible person, (10) there was no showing that the informant was knowledgeable about the process of "cooking" amphetamine, and (11) there was no probable cause to issue the search warrant on the basis of a person "cooking" amphetamine as that in and of itself is not a violation of the law.

Appellant argues that under both the "two-pronged" test of *Aguilar v. Texas*, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964), and the "totality of the circumstances" test of *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983) for establishing probable cause, the affidavit in support of the search warrant in this case fails. We will determine the validity of the search warrant according to the "totality of the circumstances" analysis of *Illinois v. Gates*. *See Hennessy v. State*, 660 S.W.2d 87, 90 (Tex.Crim.App.1983).

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair prob-

ability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed.

*Illinois v. Gates,* 103 S.Ct. at 2332.

The search warrant's affidavit in this case is set out above under grounds of error two and three. Appellant argues that the search warrant does not show the basis for the informant's veracity or reliability and that it shows the informant was under the influence of a "drug other than alcohol" at the time she was giving the affiant the information.

■■■■ We disagree that the informant's reliability and veracity were not established, and that her being under the influence of drugs affected same. The affidavit here contains sufficient facts to have given the magistrate a "substantial basis" for concluding probable cause existed. The affiant relied upon a statement given him by appellant's wife of her personal observation and knowledge. The informant had observed appellant "cooking" a large quantity of amphetamine at their residence. Although the affidavit states she appeared to be, at the time of her statement, under the influence of a drug, this fact alone does not imply that her ability to tell the truth was in any way lessened. A magistrate may make reasonable inferences from the facts set forth in the affidavit. *Gish v. State,* 606 S.W.2d at 886.

■■■■ The basis for the magistrate's determination of probable cause was further supported by the affiant's personal and independent knowledge that the premises referred to by the informant was the residence of the McGlothlins, specifically that of Mr. McGlothlin, whom the affiant had recently assisted in incarcerating after seizure from him of a large amount of amphetamine. The affiant, a peace officer experienced in the identification of amphetamine, also detected a smell consistent with that of chemicals used in the manufacture of amphetamine on appellant's person on the same day as Mrs. McGlothlin's statement.

■■■■ Appellant additionally argues that, since the process for "cooking" amphetamine is complex, there should be some information in the affidavit that the informant had knowledge of the chemical process for making amphetamine to establish "probable cause". Again, appellant cites no authority in support of requiring such information, and we find none. An affiant is not required to delineate his drug identification expertise within the four corners in order to provide a magistrate with sufficient probable cause to support the issuance of a search warrant. *Richardson v. State,* 622 S.W.2d 852, 857 (Tex.Crim. App.1981).

■■■■ Further, we do not agree with appellant that the statement that a person is "cooking" amphetamine does not indicate a violation of the law. "Cooking" amphetamine necessarily implies possession thereof in that "possession", as defined in the Act, means "actual care, custody, control or management." TEX.REV.CIV.STAT. ANN. art. 4476–15, sec. 1.02(34) (Vernon Supp.1986); *see Collini v. State,* 487 S.W.2d 132, 135 (Tex.Crim.App.1972). For the reasons stated, appellant's grounds of error nine, ten and eleven are overruled.

By ground of error four, appellant contends the trial court committed reversible error in not granting his motion to dismiss for failure to grant a speedy trial.

TEX.CODE CRIM.PROC.ANN. art. 32A.02 provides, in part:

Section 1. A court shall grant a motion to set aside an indictment, information, or complaint if the state is not ready for trial within:

(1) 120 days of the commencement of a criminal action if the defendant is accused of a felony; ...

Appellant was arrested and charged in connection with this case on November 30, 1983, for the offense of possession of amphetamine more than 200 grams but less than 400 grams. He was indicted thereon

on December 12, 1983. Appellant was then reindicted for the same acts complained of on May 14, 1984, charging him with possession of amphetamine in an amount of more than 400 grams. On May 29, 1984, appellant's motion to dismiss for failure to provide him with a speedy trial was denied. At a hearing on said motion, the prosecuting district attorney testified the State had been ready since the date of appellant's arraignment on January 23, 1984. There was no formal announcement of ready during the statutory period.

Appellant argues that the State cannot be ready for trial on a charge where there is no valid indictment within the 120-day period, citing *Pate v. State*, 592 S.W.2d 620 (Tex.Crim.App.1980). However, in that case, no indictment was filed until after the 120-day period, *id.* at 621, whereas here, a valid indictment was filed during the statutory period. The controlling issue, then, is whether the State's proof of readiness at the time of the first indictment carried over to the second indictment.

■ The critical feature for determining whether an act by a party on the first indictment should carry over to any succeeding indictments is whether the indictments are subject to the same proof. *Presley v. State*, 686 S.W.2d 764, 767 (Tex.App. —Fort Worth 1985, pet. pending). Announcements of ready on one indictment will not carry over to a subsequent indictment if the indictments charge different offenses subject to different proof, even though they involve the same complaining witness and arise from the same transaction. *See Richardson v. State*, 629 S.W.2d 164, 165 (Tex.App.—Dallas 1982, pet. ref'd). *See also Perez v. State*, 678 S.W.2d 85, 87 (Tex.Crim.App.1984) (approving *Richardson* ).

■ The two indictments involved here charge offenses that are identical in every way but in the quantity of amphetamines allegedly possessed. The quantity, although varying in the two indictments, was fixed at the time of the offense. Further, the district attorney testified that he was ready to prosecute for 400 grams at the time of arraignment. We hold that the two indictments concerned the same case, so that the State's proof of readiness carried over to the second indictment. *See Presley*, 686 S.W.2d at 768. As we have found the State carried its burden of proof in showing readiness for trial, we find it unnecessary to determine whether appellant's waiver of the Speedy Trial Act was effective. For the reasons stated, we overrule appellant's fourth ground of error.

By his fifth ground of error, appellant complains the trial court committed reversible error in not granting appellant's motion for new trial in that the evidence was insufficient to show appellant was in possession of the contraband.

■ In reviewing the sufficiency of the evidence in either a direct or circumstantial evidence case, we must view the evidence in the light most favorable to the prosecution and consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. State*, 672 S.W.2d 801, 803 (Tex.Crim.App.1984); *Houston v. State*, 663 S.W.2d 455, 456 (Tex.Crim.App. 1984); *Wilson v. State*, 654 S.W.2d 465, 471 (Tex.Crim.App.1983) (opinion on rehearing). A conviction cannot be sustained if the evidence leaves any reasonable doubt as to the guilt of the accused. *Jackson v. Virginia*, 443 U.S. 307, 317–18, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979). Thus, it follows that a conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the defendant. *Johnson v. State*, 673 S.W.2d 190, 195 (Tex.Crim.App.1984); *Jackson*, 672 S.W.2d at 803.

The record shows that, at the time of execution of the search warrant, appellant was found at his house, some 100 yards away from the barn where the contraband was found. Appellant admitted to ownership and control of the area encompassing said barn. He testified, however, that he did not exercise control over the *inside* of the barn, where the lab was found. He

further testified that he had known that his wife had a drug problem and that he had suspected some illegal activity going on in the barn for some time before he was arrested, but that until that time, he was not certain the barn contained a drug lab. He had observed his wife "sneaking around and carrying things out there or driving the truck back there."

Appellant further testified that the horses quartered in the barn belonged to him, that he actively cared for them, and that he stored hay there. The barn was connected to the house by an electric line and water line, for which electricity appellant admittedly paid. Appellant also admitted to having complete access to the barn at any time. Officer Boykin and Chief Wade testified that the same strong chemical odor emanating from appellant also emanated from the amphetamine lab. We find the evidence in this case showed that appellant exercised care, custody, control and management over the contraband, and that he knew the amphetamine was contraband. The evidence affirmatively linked appellant to the amphetamine in such a manner that a reasonable inference arose that he knew of its existence and its whereabouts. *See Curtis v. State,* 519 S.W.2d 883, 885 (Tex.Crim.App.1975). Appellant's fifth ground of error is overruled.

In his sixth and seventh grounds of error, appellant complains the trial court committed reversible error in overruling his request for a charge on "parties" and a charge concerning a husband not being responsible for the independent acts of his wife in the court's charge to the jury at the guilt or innocence stage of the trial.

Where the evidence introduced upon the trial of the cause shows the active participation in the offense by two or more persons, the trial court should first remove from consideration the acts and conduct of the nondefendant actor. *McCuin v. State,* 505 S.W.2d 827, 830 (Tex.Crim.App.1974). Then, if the evidence of the conduct of the defendant then on trial would be sufficient, in and of itself, to sustain the conviction, no

submission on the law of principals (parties) is required. *Id.*

Applying this test to the facts developed at appellant's trial we hold it was not necessary for the court to have charged the jury concerning the law of parties. The record, at the most, shows some evidence of joint possession by appellant and his wife. However, the evidence is sufficient to show possession by appellant apart from any evidence of his wife's conduct. It follows from this holding, that it was not necessary for the court to charge the jury concerning a husband not being responsible for the independent acts of his wife. There was no evidence to imply appellant was responsible for any of his wife's actions.

The case relied upon by appellant for his contention that a charge on the law of parties was necessary, is misplaced. *See Oliver v. State,* 160 Tex.Cr.R. 222, 268 S.W.2d 467, 470 (1954). There, no evidence was introduced to support a finding by the jury that the defendant was guilty as a principal. *Id.* The only theory upon which the State could have relied was that he acted as a principal (party) with another man, who had admittedly killed the deceased. *Id.*

In the case on appeal, had appellant shown error in the trial court's omission of such charges, such error would be harmless under the standard of *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App. 1984) (opinion on rehearing). Appellant's sixth and seventh grounds of error are overruled.

In his ground of error eight, appellant contends the trial court committed reversible error in not granting appellant's motion for a new trial based upon the affidavit of juror Redeker showing the jury discussed parole laws that caused the juror to vote for increased punishment.

It is well-established that any discussion of the parole laws by the jury is always misconduct. *Munroe v. State,* 637 S.W.2d 475, 476 (Tex.Crim.App.1982); *Sanders v. State,* 580 S.W.2d 349, 351 (Tex. Crim.App.1979). However, such miscon-

duct does not always constitute the denial of a fair and impartial trial. *Munroe*, 637 S.W.2d at 477. What does constitute such degree of misconduct as to deny the defendant a fair and impartial trial must be determined upon the facts of the individual case. *Heredia v. State*, 528 S.W.2d 847, 853 (Tex.Crim.App.1975). The test to be applied to determine whether a jury's discussion of the parole laws constitutes reversible error is a five-prong test recently readopted by the Court of Criminal Appeals in *Sneed v. State*, 670 S.W.2d 262 (Tex. Crim.App.1984). To demonstrate reversible error, it must be shown that there was:

(1) a misstatement of the law

(2) asserted as a fact

(3) by one professing to know the law

(4) which is relied upon by the jurors

(5) who for that reason changed their vote to a harsher punishment.

*Id.* at 266.

It is also well-established that issues of fact as to jury misconduct raised at a hearing on motion for new trial are for the determination of the trial judge, and where there is conflicting evidence there is no abuse of discretion where the motion for new trial is overruled. *Id.*

During appellant's hearing on his motion for new trial, two juror affidavits were admitted into evidence. Juror Redeker's affidavit stated, in pertinent part:

During the deliberations at the Punishment stage of the trial, several of the jurors said that the Defendant would not serve all of the sentence we imposed. They said he would only serve a third or a half of what the sentence was. I am sure that this discussion influenced some of the jurors because several of them wanted to give McGlothlin less than twenty-five years. This discussion definitely influenced my vote as I would never have voted for the twenty-five years except fo[r] the talk about him only serving part of the sentence.

Juror Redeker did not testify at the motion for new trial hearing.

Jury foreman Rozzell's affidavit stated, in pertinent part:

During the deliberations at the Punishment phase of the trial noted above, a statement was made by a couple of the jurors present that the defendant would likely not serve the entire sentence imposed by the jury. Immediately upon such statement being made, I told all of the jurors that such matters could not be considered and that this statement could not enter into their deliberations. I further told them that I, as foreman, would not allow the matter of parole to be discussed. There was no discussion by the jurors of the parole laws or of how long the defendant would actually serve on his sentence, and no juror stated during deliberations that he favored a particular punishment because of the effect of the parole law, including the juror David Wesley Redeker. Only one formal vote was taken on the verdict for punishment. This was done on paper ballot, and the vote was unanimous for the sentence of twenty-five years in the penitentiary and a fine of $50,000.00. The juror David Wesley Redeker sat silent throughout the deliberations on punishment until he was asked directly by me how he would commit himself on the question of punishment. At this point, Redeker stated that he did agree that the punishment of the defendant should be assessed at twenty-five years in the penitentiary and a fine of $50,000.00. He did not, at any time, state that his vote was in any way affected by a consideration of the parole laws.

Jury foreman Rozzell did testify at the hearing. Testimony was elicited from Rozzell that there were no statements made to the effect that one of the jurors professed to be familiar with the parole laws. He further testified that the juror's statement concerning parole laws was not asserted as a fact that appellant would, in fact, serve less than his full sentence. Foreman Rozzell stated that the extent of the discussion was that one woman juror mentioned the fact that appellant would not "serve his time ... that we would put on him, ... and

then another lady, she spoke up, and at that moment I put a stop to the whole thing."

■■■ Applying the test in *Sneed* to the facts of this case, we find appellant was not denied a fair and impartial trial as there was no misstatement of the law by one who professed to know the law. The brief comment that was made concerning parole was immediately suppressed by the jury foreman.

■■■ We decline appellant's request to ignore *Sneed* and to reinstate the rule laid out in *Munroe.* To do so would be to overstep our power as an intermediate appellate court, as well as to ignore a well-reasoned opinion and holding.

Given the conflicting evidence as to what actually occurred during the jury deliberations, we hold that the trial court did not abuse its discretion in not granting appellant's motion for a new trial. Appellant's eighth ground of error is overruled.

In his twelfth ground of error, appellant complains the trial court erred in overruling his motion for a mistrial when the prosecutor asked the court to instruct the appellant on the law concerning aggravated perjury.

■■■ To cause reversal, the improper question must be obviously harmful to the defendant. *Cavender v. State,* 547 S.W.2d 601, 603 (Tex.Crim.App.1977). Further, any error in asking an improper question may be generally cured or rendered harmless by a withdrawal of such testimony and an instruction to disregard. *Id.* The exception to this general rule occurs when it appears that the question or the evidence is clearly calculated to inflame the minds of the jury and is of such character as to suggest the impossibility of withdrawing the impression produced on their minds. *Id.*

At trial, during the State's cross-examination of appellant, the following exchange took place:

Q Mr. McGlothlin, do you know what the word perjury means?

A Yes, sir, I do.

Q What is it?

A I suppose that is when you don't tell the truth on the witness stand, or when you are under oath.

THE COURT: You can't hear?

JUROR: No, sir.

THE COURT: Speak up.

A I told him yes, that I did understand what perjury was.

Q Do you know what the penalty is for it?

A No, sir.

MR. McGAUGHEY: Your Honor, I would request that the Court inform the witness of the penalties of perjury; aggravated perjury.

MR. ROE: Your Honor, I am going—

THE COURT: Approach the Bench.

(THEREUPON DISCUSSION HAD OUTSIDE THE RECORD AND OUTSIDE HEARING OF THE JURY, AND THEREUPON THE PROCEEDINGS CONTINUED IN HEARING OF THE JURY AS FOLLOWS.)

MR. McGAUGHEY: Your Honor, I will withdraw the question.

MR. ROE: Well, even though he has withdrawn it, I am going to object to it. I don't think it is proper. It is prejudicial. It serves no purpose, and it is only—

THE COURT: It has been withdrawn.

MR. ROE: It is only done to try to prejudice the jury against my client, and I object to it.

Could you rule on my objection?

THE COURT: It has been withdrawn.

MR. ROE: Does that mean it is overruled?

THE COURT: No. The question isn't here.

MR. ROE: Well, I have objected to it being asked. That is what my objection goes to.

THE COURT: Well, he has already withdrawn the question. What do you want me to do?

MR. ROE: Could you instruct the jury not to consider—

THE COURT: That I can do, if that is what you want me to do.

The jury is instructed not to consider it.

MR. ROE: I would ask for a mistrial at this time.

THE COURT: Overruled.

Appellant argues that the question concerning whether appellant knew the punishment for perjury constitutes reversible error in that its effect was to imply to the jury that the State had clear, overpowering evidence that appellant was committing perjury and that they intended to prosecute appellant for that crime.

The cases cited by appellant in support of us finding reversible error are not on point with the facts in the case at hand. Each of those cases involved a finding of reversible error either because a reputation witness was basing his opinion concerning the other witnesses' reputation for veracity on his own personal belief, rather than upon the other witnesses' general reputation in the community, *see Parasco v. State*, 168 Tex. Cr.R. 89, 323 S.W.2d 257, 258–59 (1959), or because the prosecutor was asking a witness about extraneous offenses by the accused with little or no evidence of same. *See Cavender v. State*, 547 S.W.2d at 602–03 and *Jackson v. State*, 363 S.W.2d 947, 947–48 (Tex.Crim.App.1963).

■ In the case at hand, the accused was questioned by the prosecutor concerning the former's understanding of the oath under which he was testifying, and the consequences of his violating it. Such questioning is arguably improper in that it implies to the jury that the prosecutor has reason to believe, based on evidence not admitted, that appellant was not telling the truth. We do not, however, find that such an implication on the part of the prosecutor constitutes reversible error for the reason that the question was withdrawn and an instruction to disregard was given. We hold that the prosecutor's questions and request for an instruction concerning perjury were not calculated to inflame the jury

and were not of such a character as to suggest the impossibility of withdrawing the impression produced on the jury's minds. *See Cavender*, 547 S.W.2d at 603.

Appellant further argues, by the same ground of error, that the prosecutor's error was compounded by the trial court's refusal to rule on the objection in front of the jury, in that the resulting impression on the jury was that the trial court agreed with the prosecutor's assessment of the appellant's testimony.

■ Appellant cites two cases in support of his position. We distinguish both on their respective facts. In both *McClory v. State*, 510 S.W.2d 932 (Tex.Crim.App. 1974) and in *Snow v. State*, 167 Tex.Cr.R. 183, 318 S.W.2d 893 (1958) the judge volunteered a statement which implied to the jury his opinion on the evidence in the case. *See McClory*, 510 S.W.2d at 933; *Snow*, 318 S.W.2d at 893. Here, the judge did not comment on any evidence. Rather, he refrained from ruling upon appellant's objection and was correct in doing so in that the prosecutor's question had been withdrawn; there was nothing upon which to rule. The judge's comment of "[t]hat I can do, if that is what you want me to do," was apparently in response to appellant's repeated requests to rule upon a question that had already been withdrawn. We find that the judge's actions were proper in this case. Appellant's twelfth ground of error is overruled.

By ground of error thirteen, appellant complains the trial court committed reversible error in not granting appellant's motion for new trial in that there was insufficient evidence to show the quantity of amphetamine was over 400 grams.

Appellant was convicted under section 4.042(d)(2) of the Texas Controlled Substances Act. TEX.REV.CIV.STAT.ANN. art. 4476–15, sec. 4.042(d)(2) (Vernon Supp. 1986). That section of the Act makes it unlawful to possess amphetamine "if the amount of the controlled substance possessed is, by aggregate weight, *including*

*any adulterants or dilutants, 400 grams or more." Id.* (Emphasis added.)

At trial, the State called Glen Carl Harbison to testify as their expert chemist. Through his testimony, the State introduced various drug paraphernalia containing what Harbison identified as amphetamine, and which had been confiscated from the "lab" set up in appellant's barn. Harbison testified that the total gram weight, including any adulterants or dilutants, of the amphetamine substances analyzed by him was 3,118 grams. One vial, admitted as State's Exhibit 24, contained 2,845 grams of the total 3,118 grams. On cross-examination, it was revealed that this particular vial contained an aqueous layer; that is, it was "mostly water," and an organic layer on top. Harbison testified that the two layers do not mix and that it was "most likely" the organic layer that had the amphetamine in it. He admitted that there was only a residual and insignificant amount of actual amphetamine in the aqueous layer. Harbison described the aqueous layer as an "adulterant," which he defined as something which would take away from the purity of the compound. He further testified that he did not know the separate weights of the aqueous and organic layers.

Appellant called Max Courtney at trial as its expert chemist. Courtney testified that he had tested samples from both the aqueous and the organic layers of State's Exhibit 24 and that he did not find any amphetamine present in the aqueous layer. He further testified that he did not consider the aqueous layer to be either an adulterant or a dilutant for the organic layer, and that the former layer comprised 96 percent of State's Exhibit 24. However, this latter conclusion was admittedly based upon an in-court, visual observation of the vial, and not upon any pretrial laboratory analysis. In Courtney's words, "I could make an estimate [of what percent of State's Exhibit 24 is aqueous and what percent organic]. I obviously could not make an accurate determination of it." He concluded that if one subtracted the aqueous layer from State's Exhibit 24, then the total weight of the material containing amphetamine would be less than 400 grams.

Appellant argues that the State failed to carry its burden of proving appellant possessed over 400 grams of amphetamine, as the aqueous layer should not have been included in the calculation of the weight. On appeal during oral argument, appellant presented a hypothetical situation wherein someone throws a small amount of amphetamine in a bathtub full of water and is thereby convicted for possession of a gram weight equal to that of the weight of the bathtub's water. He reasons that, if the aqueous layer is included in computing the weight, then any amount of water, ad infinitum, could be included, as long as a trace of amphetamine is present. He argues that the legislative intent in including "adulterants and dilutants" in the statute was to cover situations wherein "trash" is added to certain drugs for sale on the street. Appellant argues that, while such "trash" should be included in the computation of weight, the liquid used to "cook" amphetamine should not. His position is that the intent of the statute is to remove such impurities before weighing the substances for the purposes of conviction.

We first note that this issue appears to be a case of first impression in Texas. We also note that the words "adulterants and dilutants" as used in section 4.042 of the Texas Controlled Substances Act, are not defined by statute or case law.

To "adulterate" is defined: "to corrupt, debase, or make impure by the addition of a foreign or a baser substance: prepare (as for sale) with one or more ingredients included that are not part of the alleged substance." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981). To "dilute" is defined: "2a(1) to make thinner or more liquid by admixture (as with water) (2): to make less concentrated: diminish the strength, activity or flavor of (as by thinning or introducing an inert substance)." *Id.*

The cardinal rule of statutory interpretation is to ascertain the legislative

intent in enacting a statute. *Faulk v. State*, 608 S.W.2d 625, 631 (Tex.Crim.App. 1980). Such intent and a determination of the meaning of a statute is to be based upon the language of the statute itself. *Id.*

We agree with appellant that a conviction based upon his hypothetical situation would be unconstitutional. However, the definitions set out above demonstrate the distinction between such a situation and the facts in the case at hand. The significant difference is one of intent. To dilute or adulterate a substance is to intentionally add a foreign substance in order to either prepare the original substance, or to lessen its strength or purity. The obvious intent of the legislature in including adulterants and dilutants in the computation of weight was to prevent unlawful drug possessors from avoiding conviction simply because of the particular stage of production in which the drugs might be found at any given time by law enforcement officers. The enacting legislators knew that amphetamine is made by "cooking" various chemicals in liquid for a period of time, and therefore were aware of the likelihood of drugs being possessed and confiscated upon arrest in such a form. A different situation is presented where a person, in order to avoid being caught with drugs, throws them into a body of water not associated with the drugs' manufacture. We hold that, since here there was evidence that the aqueous fluid was found together with an organic layer of amphetamine as part of an amphetamine lab, that the legislature intended for such fluid to be included in weighing the substance for purposes of conviction under the Controlled Substances Act. Appellant's thirteenth ground of error is overruled.

Judgment affirmed.