# UNITED STATES *v.* DUNN

No. 85–998.   Argued January 20, 1987—Decided March 3, 1987

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, POWELL, STEVENS, and O'CONNOR, JJ., joined, and in all but the paragraph headed *"Third"* in Part II of which SCALIA, J., joined. SCALIA, J., filed an opinion concurring in part, *post*, p. 305. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 305.

*Roy T. Englert, Jr.,* argued the cause for the United States. With him on the briefs were *Solicitor General*

*Fried, Assistant Attorney General Trott,* and *Deputy Solicitor General Bryson.*

*Louis Dugas, Jr.,* argued the cause and filed a brief for respondent.

JUSTICE WHITE delivered the opinion of the Court.

We granted the Government's petition for certiorari to decide whether the area near a barn, located approximately 50 yards from a fence surrounding a ranch house, is, for Fourth Amendment purposes, within the curtilage of the house. The Court of Appeals for the Fifth Circuit held that the barn lay within the house's curtilage, and that the District Court should have suppressed certain evidence obtained as a result of law enforcement officials' intrusion onto the area immediately surrounding the barn. 782 F. 2d 1226 (1986). We conclude that the barn and the area around it lay outside the curtilage of the house, and accordingly reverse the judgment of the Court of Appeals.

I

Respondent Ronald Dale Dunn and a codefendant, Robert Lyle Carpenter, were convicted by a jury of conspiring to manufacture phenylacetone and amphetamine, and to possess amphetamine with intent to distribute, in violation of 21 U. S. C. § 846. Respondent was also convicted of manufacturing these two controlled substances and possessing amphetamine with intent to distribute. The events giving rise to respondent's apprehension and conviction began in 1980 when agents from the Drug Enforcement Administration (DEA) discovered that Carpenter had purchased large quantities of chemicals and equipment used in the manufacture of amphetamine and phenylacetone. DEA agents obtained warrants from a Texas state judge authorizing installation of miniature electronic transmitter tracking devices, or "beepers," in an electric hot plate stirrer, a drum of acetic anhydride, and a container holding phenylacetic acid, a precursor to phenylacetone. All of these items had been ordered by

Carpenter. On September 3, 1980, Carpenter took possession of the electric hot plate stirrer, but the agents lost the signal from the "beeper" a few days later. The agents were able to track the "beeper" in the container of chemicals, however, from October 27, 1980, until November 5, 1980, on which date Carpenter's pickup truck, which was carrying the container, arrived at respondent's ranch. Aerial photographs of the ranch property showed Carpenter's truck backed up to a barn behind the ranch house. The agents also began receiving transmission signals from the "beeper" in the hot plate stirrer that they had lost in early September and determined that the stirrer was on respondent's ranch property.

Respondent's ranch comprised approximately 198 acres and was completely encircled by a perimeter fence. The property also contained several interior fences, constructed mainly of posts and multiple strands of barbed wire. The ranch residence was situated ½ mile from a public road. A fence encircled the residence and a nearby small greenhouse. Two barns were located approximately 50 yards from this fence. The front of the larger of the two barns was enclosed by a wooden fence and had an open overhang. Locked, waist-high gates barred entry into the barn proper, and netting material stretched from the ceiling to the top of the wooden gates.

On the evening of November 5, 1980, law enforcement officials made a warrantless entry onto respondent's ranch property. A DEA agent accompanied by an officer from the Houston Police Department crossed over the perimeter fence and one interior fence. Standing approximately midway between the residence and the barns, the DEA agent smelled what he believed to be phenylacetic acid, the odor coming from the direction of the barns. The officers approached the smaller of the barns—crossing over a barbed wire fence—and, looking into the barn, observed only empty boxes. The officers then proceeded to the larger barn, crossing another

barbed wire fence as well as a wooden fence that enclosed the front portion of the barn. The officers walked under the barn's overhang to the locked wooden gates and, shining a flashlight through the netting on top of the gates, peered into the barn. They observed what the DEA agent thought to be a phenylacetone laboratory. The officers did not enter the barn.[1] At this point the officers departed from respondent's property, but entered it twice more on November 6 to confirm the presence of the phenylacetone laboratory.

On November 6, 1980, at 8:30 p.m., a Federal Magistrate issued a warrant authorizing a search of respondent's ranch. DEA agents and state law enforcement officials executed the warrant on November 8, 1980.[2] The officers arrested re-

---

[1] In denying respondent's motion to suppress all evidence obtained as a result of the search warrant, the District Court Judge stated that the law enforcement officials, during their incursions onto respondent's property, "did not invade the premises, that is, the houses or the barns . . . ." Tr. 216. The Court of Appeals did not disturb this finding. At the suppression hearing, the DEA agent described the officers' approach to the large barn on November 5:

"A. We came back around, we crossed a small wooden type fence here, which put us right underneath a type of a tin overhang and in front of us was a wooden locked gate . . . .

.        .        .        .        .

"Q. How high was that gate?
"A. It probably came up to my waist, estimated.
"Q. Was that gate open or shut?
"A. It was shut and it was locked.
"Q. Was there anything above that gate?
"A. Yes, there was.
"Q. What was that?
"A. A fish netting, kind of a netting, that was hanging from the ceiling down to the gate.
"Q. Did you cross over that gate and go into the barn?
"A. No.
"Q. Did you stand outside the gate?
"A. We stood right at the gate."

App. 17–18.

[2] Prior to the actual search of the barn and ranch house, the agents entered the property for further observations.

spondent and seized chemicals and equipment, as well as bags of amphetamines they discovered in a closet in the ranch house.

The District Court denied respondent's motion to suppress all evidence seized pursuant to the warrant and respondent and Carpenter were convicted. In a decision rendered in 1982, the Court of Appeals reversed respondent's conviction. *United States* v. *Dunn*, 674 F. 2d 1093. The court concluded that the search warrant had been issued based on information obtained during the officers' unlawful warrantless entry onto respondent's ranch property and, therefore, all evidence seized pursuant to the warrant should have been suppressed. Underpinning this conclusion was the court's reasoning that "the barn in question was within the curtilage of the residence and was within the protective ambit of the fourth amendment." *Id.*, at 1100. We granted the Government's petition for certiorari, vacated the judgment of the Court of Appeals, and remanded the case for further consideration in light of *Oliver* v. *United States*, 466 U. S. 170 (1984). 467 U. S. 1201 (1984). On remand, the Court of Appeals reaffirmed its judgment that the evidence seized pursuant to the warrant should have been suppressed, but altered the legal basis supporting this conclusion: the large barn was not within the curtilage of the house, but by standing outside the barn and peering into the structure, the officers nonetheless violated respondent's "reasonable expectation of privacy in his barn and its contents." 766 F. 2d 880, 886 (1985). The Government again filed a petition for certiorari. On January 17, 1986, before this Court acted on the petition, the Court of Appeals recalled and vacated its judgment issued on remand, stating that it would enter a new judgment in due course. 781 F. 2d 52. On February 4, 1986, the Court of Appeals reinstated the original opinion rendered in 1982, asserting that "[u]pon studied reflection, we now conclude and hold that the barn was inside the protected curtilage." 782 F. 2d, at 1227. The Government thereupon submitted a supplement to its petition for certiorari, revising the question pre-

sented to whether the barn lay within the curtilage of the house. We granted the petition, 477 U. S. 903, and now reverse.

## II

The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself. The concept plays a part, however, in interpreting the reach of the Fourth Amendment. *Hester* v. *United States*, 265 U. S. 57, 59 (1924), held that the Fourth Amendment's protection accorded "persons, houses, papers, and effects" did not extend to the open fields, the Court observing that the distinction between a person's house and open fields "is as old as the common law. 4 Bl. Comm. 223, 225, 226."[3]

We reaffirmed the holding of *Hester* in *Oliver* v. *United States, supra.* There, we recognized that the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself. 466 U. S., at 180. We identified the central component of this inquiry as whether the area harbors the "intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Ibid.* (quoting *Boyd* v. *United States*, 116 U. S. 616, 630 (1886)).

---

[3] In the section of Blackstone's Commentaries which the Court cited, Blackstone described the elements of common-law burglary, and elaborated on the element that a breaking occur in a mansion or dwelling house. In defining the terms "mansion or dwelling-house," Blackstone wrote that "no distant barn, warehouse, or the like are under the same privileges, nor looked upon as a man's castle of defence . . . ." 4 W. Blackstone, Commentaries *225. Blackstone observed, however, that "if the barn, stable, or warehouse, be parcel of the mansion-house, and within the same common fence, though not under the same roof or contiguous, a burglary may be committed therein; for the capital house protects and privileges all its branches and appurtenances, if within the curtilage or homestall." *Ibid.*

Drawing upon the Court's own cases and the cumulative experience of the lower courts that have grappled with the task of defining the extent of a home's curtilage, we believe that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.  See *California* v. *Ciraolo,* 476 U. S. 207, 221 (1986) (POWELL, J., dissenting) (citing *Care* v. *United States,* 231 F. 2d 22, 25 (CA10), cert. denied, 351 U. S. 932 (1956); *United States* v. *Van Dyke,* 643 F. 2d 992, 993–994 (CA4 1981)).[4]  We do not suggest that combining these factors produces a finely tuned formula that, when mechanically applied, yields a "correct" answer to all extent-of-curtilage questions.  Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's "umbrella" of Fourth Amendment protection.  Applying these factors to respondent's barn and to the area immediately surrounding it, we have little difficulty in concluding that this area lay outside the curtilage of the ranch house.

---

[4] We decline the Government's invitation to adopt a "bright-line rule" that "the curtilage should extend no farther than the nearest fence surrounding a fenced house."  Brief for United States 14.  Fencing configurations are important factors in defining the curtilage, see *infra,* at 302, but, as we emphasize above, the primary focus is whether the area in question harbors those intimate activities associated with domestic life and the privacies of the home.  Application of the Government's "first fence rule" might well lead to diminished Fourth Amendment protection in those cases where a structure lying outside a home's enclosing fence was used for such domestic activities.  And, in those cases where a house is situated on a large parcel of property and has no nearby enclosing fence, the Government's rule would serve no utility; a court would still be required to assess the various factors outlined above to define the extent of the curtilage.

*First.* The record discloses that the barn was located 50 yards from the fence surrounding the house and 60 yards from the house itself. 766 F. 2d, at 882–883; 782 F. 2d, at 1228. Standing in isolation, this substantial distance supports no inference that the barn should be treated as an adjunct of the house.

*Second.* It is also significant that respondent's barn did not lie within the area surrounding the house that was enclosed by a fence. We noted in *Oliver, supra,* that "for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience." 466 U. S., at 182, n. 12. Viewing the physical layout of respondent's ranch in its entirety, see 782 F. 2d, at 1228, it is plain that the fence surrounding the residence serves to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house. Conversely, the barn—the front portion itself enclosed by a fence—and the area immediately surrounding it, stands out as a distinct portion of respondent's ranch, quite separate from the residence.

*Third.* It is especially significant that the law enforcement officials possessed objective data indicating that the barn was not being used for intimate activities of the home. The aerial photographs showed that the truck Carpenter had been driving that contained the container of phenylacetic acid was backed up to the barn, "apparently," in the words of the Court of Appeals, "for the unloading of its contents." 674 F. 2d, at 1096. When on respondent's property, the officers' suspicion was further directed toward the barn because of "a very strong odor" of phenylacetic acid. App. 15. As the DEA agent approached the barn, he "could hear a motor running, like a pump motor of some sort . . . ." *Id.,* at 17. Furthermore, the officers detected an "extremely strong" odor of phenylacetic acid coming from a small crack in the

wall of the barn. *Ibid.* Finally, as the officers were standing in front of the barn, immediately prior to looking into its interior through the netting material, "the smell was very, very strong . . . [and the officers] could hear the motor running very loudly." *Id.*, at 18. When considered together, the above facts indicated to the officers that the use to which the barn was being put could not fairly be characterized as so associated with the activities and privacies of domestic life that the officers should have deemed the barn as part of respondent's home.

*Fourth.* Respondent did little to protect the barn area from observation by those standing in the open fields. Nothing in the record suggests that the various interior fences on respondent's property had any function other than that of the typical ranch fence; the fences were designed and constructed to corral livestock, not to prevent persons from observing what lay inside the enclosed areas.

## III

Respondent submits an alternative basis for affirming the judgment below, one that was presented to but ultimately not relied upon by the Court of Appeals. Respondent asserts that he possessed an expectation of privacy, independent from his home's curtilage, in the barn and its contents, because the barn is an essential part of his business. Brief for Respondent 9. Respondent overlooks the significance of *Oliver* v. *United States*, 466 U. S. 170 (1984).

We may accept, for the sake of argument, respondent's submission that his barn enjoyed Fourth Amendment protection and could not be entered and its contents seized without a warrant. But it does not follow on the record before us that the officers' conduct and the ensuing search and seizure violated the Constitution. *Oliver* reaffirmed the precept, established in *Hester*, that an open field is neither a "house" nor an "effect," and, therefore, "the government's intrusion upon the open fields is not one of those 'unreasonable searches'

proscribed by the text of the Fourth Amendment." 466 U. S., at 177. The Court expressly rejected the argument that the erection of fences on an open field—at least of the variety involved in those cases and in the present case—creates a constitutionally protected privacy interest. *Id.*, at 182–183. "[T]he term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither 'open' nor a 'field' as those terms are used in common speech." *Id.*, at 180, n. 11. It follows that no constitutional violation occurred here when the officers crossed over respondent's ranch-style perimeter fence, and over several similarly constructed interior fences, prior to stopping at the locked front gate of the barn. As previously mentioned, the officers never entered the barn, nor did they enter any other structure on respondent's premises. Once at their vantage point, they merely stood, outside the curtilage of the house and in the open fields upon which the barn was constructed, and peered into the barn's open front. And, standing as they were in the open fields, the Constitution did not forbid them to observe the phenylacetone laboratory located in respondent's barn. This conclusion flows naturally from our previous decisions.

Under *Oliver* and *Hester*, there is no constitutional difference between police observations conducted while in a public place and while standing in the open fields. Similarly, the fact that the objects observed by the officers lay within an area that we have assumed, but not decided, was protected by the Fourth Amendment does not affect our conclusion. Last Term, in *California* v. *Ciraolo*, 476 U. S. 207 (1986), we held that warrantless naked-eye aerial observation of a home's curtilage did not violate the Fourth Amendment. We based our holding on the premise that the Fourth Amendment "has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." *Id.*, at 213. Importantly, we deemed it irrelevant that the police observation at issue

was directed specifically at the identification of marijuana plants growing on an area protected by the Fourth Amendment. *Ibid.* Finally, the plurality opinion in *Texas* v. *Brown,* 460 U. S. 730, 739–740 (1983), notes that it is "beyond dispute" that the action of a police officer in shining his flashlight to illuminate the interior of a car, without probable cause to search the car, "trenched upon no right secured . . . by the Fourth Amendment." The holding in *United States* v. *Lee,* 274 U. S. 559, 563 (1927) is of similar import. Here, the officers' use of the beam of a flashlight, directed through the essentially open front of respondent's barn, did not transform their observations into an unreasonable search within the meaning of Fourth Amendment.

The officers lawfully viewed the interior of respondent's barn, and their observations were properly considered by the Magistrate in issuing a search warrant for respondent's premises. Accordingly, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE SCALIA, concurring in part.

I join JUSTICE WHITE's opinion with the exception of the paragraph in Part II headed *"Third."* It does not seem to me "especially significant that the law enforcement officials possessed objective data indicating that the barn was not being used for intimate activities of the home." *Ante,* at 302. What is significant is that the barn was not being so used, whether or not the law enforcement officials knew it. The officers' perceptions might be relevant to whether intrusion upon curtilage was nevertheless reasonable, but they are no more relevant to whether the barn was curtilage than to whether the house was a house.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

The Government agents' intrusions upon Ronald Dunn's privacy and property violated the Fourth Amendment for

two reasons. First, the barnyard invaded by the agents lay within the protected curtilage of Dunn's farmhouse. Second, the agents infringed upon Dunn's reasonable expectation of privacy in the barn and its contents. Our society is not so exclusively urban that it is unable to perceive or unwilling to preserve the expectation of farmers and ranchers that barns and their contents are protected from (literally) unwarranted government intrusion.

## I

I briefly recount the relevant facts.

Respondent's ranch of 198 acres is encircled by a perimeter fence. The residence and its outbuildings are located in a clearing surrounded by woods, one-half mile from a road, down a chained, locked driveway. Neither the farmhouse nor its outbuildings are visible from the public road or from the fence that encircles the entire property. Once inside this perimeter fence, it is necessary to cross at least one more "substantial" fence before approaching Dunn's farmhouse or either of his two barns. *United States* v. *Dunn,* 674 F. 2d 1093, 1100 (CA5 1982).

The front of the barn involved here is enclosed by a wooden fence. Its back and sides

> "were composed of brick, metal siding, and large metal sliding doors and were completely enclosed. The front of the barn was partially composed of a wooden wall with windows. The remainder was enclosed by waist-high wood slatting and wooden gates. At the time of [the] agent['s] visits . . . , the top half of the front of the barn was covered by a fishnet type material from the ceiling down to the top of the locked wooden gates. To see inside the barn it was necessary to stand immediately next to the netting [under the barn's overhang]. From as little as a few feet distant, visibility into the barn was obscured by the netting and slatting." 766 F. 2d 880, 883 (CA5 1985).

The issues are whether the barn was within the protected curtilage of the house, and whether the conduct of the Drug Enforcement Agency (DEA) agents—"circling the large barn, being unable to see inside through the back or sides, climbing a wooden fence at its front, entering its overhang and going into the immediate proximity of the fishnet and wooden gate front enclosure"—infringed upon Dunn's reasonable expectation of privacy in the barn or its contents. *Id.*, at 884.

## II

### A

In *Oliver* v. *United States*, 466 U. S. 170 (1984), the Court affirmed its holding in *Hester* v. *United States*, 265 U. S. 57 (1924), that the Fourth Amendment protects the home and its curtilage, but not the "open fields." We explained that curtilage is "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" 466 U. S., at 180 (quoting *Boyd* v. *United States*, 116 U. S. 616, 630 (1886)).

The Court states that curtilage questions are often resolved through evaluation of four factors: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Ante*, at 301. The Court applies this test and concludes that Dunn's barn and barnyard were not within the curtilage of his dwelling. This conclusion overlooks the role a barn plays in rural life and ignores extensive authority holding that a barn, when clustered with other outbuildings near the residence, is part of the curtilage.

State and federal courts have long recognized that a barn, like many other outbuildings, is "a domestic building constituting an integral part of that group of structures making up the farm home." *Walker* v. *United States*, 225 F. 2d 447, 449 (CA5 1955). Consequently, the general rule is that the

"[c]urtilage includes all outbuildings used in connection with a residence, such as garages, sheds, [and] *barns . . .* connected with and in close vicinity of the residence." *Luman* v. *Oklahoma,* 629 P. 2d 1275, 1276 (Okla. Crim. App. 1981) (emphasis added).

The overwhelming majority of state courts have consistently held that barns are included within the curtilage of a farmhouse. See, *e. g., Brown* v. *Oklahoma City,* 721 P. 2d 1346, 1349 (Okla. App. 1986) ("[C]urtilage . . . includes, among other things, garages, sheds, barns and the like"); *McGlothlin* v. *State,* 705 S. W. 2d 851, 857 (Tex. App. 1986) (barn located 100 yards from residence is within curtilage); *State* v. *Fierge,* 673 S. W. 2d 855, 856 (Mo. App. 1984) ("[C]urtilage includes all outbuildings used in connection with the residence, such as garages, sheds, barns, yards, and lots connected with or in the close vicinity of the residence"); *State* v. *Simpson,* 639 S. W. 2d 230, 232 (Mo. App. 1982) (same); *Luman* v. *Oklahoma, supra* (same); *Bunn* v. *State,* 153 Ga. App. 270, 272, 265 S. E. 2d 88, 90 (1980) ("'[c]urtilage' includes the yards and grounds of a particular address, its garages, barns, buildings, etc."); *State* v. *Vicars,* 207 Neb. 325, 330, 299 N. W. 2d 421, 425 (1980) (calf shed located 100 feet from the house and separated from it by chain link fence which surrounded the yard was within curtilage); *State* v. *Browning,* 28 N. C. App. 376, 379, 221 S. E. 2d 375, 377 (1976) (curtilage of the home includes "'at least the yard around the dwelling house as well as the area occupied by barns, cribs, and other outbuildings'") (quoting *State* v. *Frizzelle,* 243 N. C. 49, 51, 89 S. E. 2d 725, 726 (1955)); *Norman* v. *State,* 134 Ga. App. 767, 768, 216 S. E. 2d 644, 645 (1975) (truck containing moonshine liquor located 200 feet from farmhouse and 100 feet from barn was within curtilage); *Brinlee* v. *State,* 403 P. 2d 253, 256 (Okla. Crim. App. 1965) (cattle located 100 yards from home in a lot adjacent to the barn were within curtilage); *State* v. *Lee,* 120 Ore. 643, 648, 253 P. 533, 534 (1927) ("Premises other than dwellings have

been held within the protection of the Fourth Amendment[,] for example a barn. As construed by the courts from the earliest to the latest times the words 'dwelling' or 'dwelling-house' have been construed to include not only the main but all the cluster of buildings convenient for the occupants of the premises, generally described as within the curtilage").

Federal courts, too, have held that barns, like other rural outbuildings, lie within the curtilage of the farmhouse. See *United States* v. *Berrong*, 712 F. 2d 1370, 1374 (CA11 1983) ("[t]he 'outer limits of the curtilage' have been expressly defined to be 'the outer walls of the extreme outbuildings'") (quoting *United States* v. *Williams*, 581 F. 2d 451, 454 (CA5 1978)); *Rosencranz* v. *United States*, 356 F. 2d 310, 313 (CA1 1966) (barn located an unknown distance from house and separated from it by a driveway deemed within curtilage); *Walker* v. *United States, supra* (barn located 70 to 80 yards from house, separated from house by private driveway, and surrounded by separate fence is within curtilage); *United States* v. *Swann*, 377 F. Supp. 1305, 1306 (Md. 1974) (barns and outbuildings on farm were part of curtilage); *United States* v. *King*, 305 F. Supp. 630, 634 (ND Miss. 1969) (barns and other outbuildings of unknown distance from house within curtilage).

Thus, case law demonstrates that a barn is an integral part of a farm home and therefore lies within the curtilage. The Court's opinion provides no justification for its indifference to the weight of state and federal precedent.

The above-cited authority also reveals the infirmities in the Court's application of its four-part test. First, the distance between the house and the barn does not militate against the barn or barnyard's presence in the curtilage. Many of the cases cited involve a barn separated from a residence by a distance in excess of 60 yards. Second, the cases make evident that the configuration of fences is not determinative of the status of an outbuilding. Here, where the barn was connected to the house by a "well walked" and a "well driven"

path, App. to Supp. to Pet. for Cert. 51a, and was clustered with the farmhouse and other outbuildings in a clearing surrounded by woods, the presence of intervening fences fades into irrelevance.

The third factor in the test—the nature of the uses to which the area is put—has been badly misunderstood and misapplied by the Court. The Court reasons that, because the barn and barnyard were not actually in domestic use, they were not within the curtilage. This reveals a misunderstanding of the level of generality at which the constitutional inquiry must proceed and is flatly inconsistent with the Court's analysis in *Oliver*.

In *Oliver*, the Court held that, as a general matter, the open fields "are unlikely to provide the setting for activities whose privacy is sought to be protected by the Fourth Amendment." 466 U. S., at 179, n. 10. The Court expressly refused to do a case-by-case analysis to ascertain whether, on occasion, an individual's expectation of privacy in a certain activity in an open field should be protected. *Id.*, at 181. In the instant case, the Court is confronted with the general rule that a barn *is* in domestic use. To be consistent with *Oliver*, the Court should refuse to do a case-by-case analysis of the expectation of privacy in any particular barn and follow the general rule that a barn is in domestic use. What should be relevant here, as in *Oliver*, is the typical use of an area or structure. The Court's willingness to generalize about the absence of a privacy interest in the open fields and unwillingness to generalize about the existence of a privacy interest in a barn near a residence are manifestly inconsistent and reflect a hostility to the purpose of the Fourth Amendment.

Moreover, the discovery that Dunn's barn was actually used as a drug laboratory is irrelevant to the question whether the area is typically in domestic use. No one would contend that, absent exigent circumstances, the police could intrude upon a home without a warrant to search for a drug

manufacturing operation. The Fourth Amendment extends that same protection to outbuildings in the curtilage of the home.

Even accepting that courts should do a case-by-case inquiry regarding the use of buildings within the curtilage, the Court's analysis is faulty. The Court finds it significant that, because of the strong odor and the noise of a motor emanating from the barn, the officers knew that the barn was not in domestic use. But these Government agents *were already within the curtilage* when they detected the odor of phenylacetic acid. They were wandering about in the area between the barns and the farmhouse, an area that is itself part of the curtilage. The Court cannot abrogate the general rule that a barn is in the curtilage with evidence gathered after the intrusion has occurred.[1]

Finally, neither the smell of the chemicals nor the sound of the motor running would remove the protection of the Fourth Amendment from an otherwise protected structure. A barn, like a home, may simultaneously be put to domestic and nondomestic uses, even the manufacture of drugs. Dual use does not strip a home or any building within the curtilage of Fourth Amendment protection. As this Court said in *Taylor* v. *United States*, 286 U. S. 1, 6 (1932), where a garage adjacent to a city residence and within its curtilage was searched for illegal alcohol, "[p]rohibition officers may rely on a distinctive odor as a physical fact indicative of possible crime; but its presence alone does not strip the owner of a building of constitutional guarantees against unreasonable

---

[1] Cf. *United States* v. *Mullin*, 329 F. 2d 295, 298 (CA4 1964) ("We are not dissuaded from this view [that the smokehouse was part of the curtilage] by testimony of Government witnesses that after entering the smokehouse they found it to be in a dilapidated condition, unfit (in their opinion) for the storage of meat. *The critical moment was the appearance of the smokehouse before entry; subsequent observations as to its condition are irrelevant.* See also United States v. Di Re, 332 U. S. 581 . . . (1948)") (emphasis added).

search."[2]   What the evidence cited by the Court might suggest is that the DEA agents had probable cause to enter the barn or barnyard *before they made any unconstitutional intrusion*.   If so—and I do not concede it—they should have obtained a warrant.

With regard to the fourth factor of the curtilage test, I find astounding the Court's conclusion that "[r]espondent did little to protect the barn area from observation by those standing in the open fields." *Ante,* at 303.   Initially, I note that the fenced area immediately adjacent to the barn in this case is not part of the open fields, but is instead part of the curtilage and an area in which Dunn had a reasonable expectation of privacy.   See *infra,* at 314–319.   Second, Dunn in fact took elaborate measures to ensure his privacy.   He locked his driveway, fenced in his barn, and covered its open end with a locked gate and fishnetting.   The Court of Appeals found that "[t]o see inside the barn it was necessary to stand immediately next to the netting.   From as little as a few feet distant, visibility into the barn was obscured by the netting and slatting."   766 F. 2d, at 883.   The Fourth Amendment does not require the posting of a 24-hour guard to preserve an expectation of privacy.

The Court of Appeals correctly concluded that Dunn's barn and barnyard were within the curtilage of the farmhouse. This Court's reversal of that determination reflects a fundamental misunderstanding of the typical role of a barn in rural domestic life.[3]

---

[2] In addition, the sound of a motor running is not inherently inconsistent with the use of the barn for domestic purposes.   Household activities on a farm may differ from those conducted in an urban apartment, but they retain their domestic character.   A barn is an integral part of a particular way of life, and its many standard uses are part of a distinctive domestic economy.

[3] This case bears out the prediction made in *Oliver* v. *United States,* 466 U. S. 170, 196, and n. 20 (1984) (MARSHALL, J., dissenting), that police officers making warrantless entries upon private land will be obliged "to make on-the-spot judgments as to how far the curtilage extends, and to

## B

Today's decision has an unforeseen consequence. In narrowing the meaning given to the concept of curtilage, the Court also narrows the scope of searches permissible under a warrant authorizing a search of building premises. Police officers often proceed as if a warrant that authorizes a search of the premises or the dwelling also authorizes a search of any outbuildings (such as garages, barns, sheds, smokehouses) because such buildings are commonly deemed within the curtilage. See *Gumina* v. *State*, 166 Ga. App. 592, 595, 305 S. E. 2d 37, 39 (1983) ("[E]ven if the [trailers] had not been described at all [in the warrant], the officers would have been authorized to search them as part of the curtilage or premises of the residence"); *Barton* v. *State*, 161 Ga. App. 591, 592, 288 S. E. 2d 914, 915 (1982) (curtilage includes yards, grounds, gardens, barn, and outbuildings; all may be searched though not specifically described in warrant, so long as warrant has been obtained to search premises); *State* v. *Vicars*, 207 Neb. 325, 299 N. W. 2d 421 (1980) (calf shed located 100 feet from house on opposite side of chain link fence that surrounded the yard is within curtilage so search war-

---

stay outside that zone" and that officers will have difficulty in doing so. I continue to believe that the rule suggested in dissent in *Oliver* is most faithful to the Fourth Amendment analysis set forth in *Katz* v. *United States*, 389 U. S. 347 (1967), and provides the clearest answer to the question of when persons possess a reasonable expectation of privacy in their property: "Private land marked in a fashion sufficient to render entry thereon a criminal trespass under the law of the State in which the land lies is protected by the Fourth Amendmen[t]." 466 U. S., at 195. By rejecting this rule, "the Court is willing to sanction the introduction of evidence seized pursuant to a potentially criminal activity (trespassing) in order to convict an individual of a slightly more serious crime." Comment, Curtilage or Open Fields?: *Oliver v. United States* Gives Renewed Significance to the Concept of Curtilage in Fourth Amendment Analysis, 46 U. Pitt. L. Rev. 795, 810, n. 87 (1985). "For good or for ill, [the Government] teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law." *Olmstead* v. *United States*, 277 U. S. 438, 485 (1928) (Brandeis, J., dissenting).

rant authorizing search of dwelling also authorizes search of outbuilding); *Bellamy* v. *State*, 134 Ga. App. 340, 214 S. E. 2d 383, 384 (1975) ("'Curtilage' comes down from early English days. An outbuilding on the grounds is within the 'curtilage' and may be searched under such a warrant, though not described specifically"); *Meek* v. *Pierce*, 19 Wis. 300, 302 (1865) ("It would destroy the utility of the proceeding, if, beside the building principally named, all other buildings and places of concealment upon the same premises, occupied in connection with it and by the same person, could not also be searched, and by virtue of the same warrant"). After today, reliance upon this general rule is illegitimate, and warrants must specify that a search of the farmer's outbuildings is also contemplated.

### III

Even if Dunn's barn were not within the curtilage of his farmhouse, his reasonable expectation of privacy in the barnyard would bring the Fourth Amendment into play.

It is well established that the Fourth Amendment protects a privacy interest in commercial premises. See *Oliver* v. *United States*, 466 U. S., at 178, n. 8 (the protection of privacy interests in business premises is "based on societal expectations that have deep roots in the history of the Amendment").[4] The questions in this case are whether a barn is a commercial structure and, if so, how far its owner's expectations of privacy reasonably extend.

The Court assumes that respondent possessed an expectation of privacy in his barn and its contents because the barn was an essential part of his business. This assumption is

---

[4] See also *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 312 (1978) (the historical foundation of the Fourth Amendment reveals that "it is untenable that the ban on warrantless searches was not intended to shield places of business as well as of residence"); *See* v. *City of Seattle*, 387 U. S. 541, 543 (1967) ("The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property").

plainly correct. A ranch or a farm is a business like any other. As the Court of Appeals, like many other courts to consider the question,[5] concluded:

> "A barn is as much a part of a rancher's place of business as a warehouse or outbuilding is part of an urban merchant's place of business. It is and ought to be constitutionally protected from warrantless searches if the owner or occupier takes reasonable steps to effect privacy." 766 F. 2d, at 885.

This established, we inquire whether the owner of a commercial building has a reasonable expectation of privacy *in the area surrounding or adjacent to that building*.[6] Since

---

[5] See also *Walker* v. *United States*, 225 F. 2d 447, 453 (CA5 1955) (Rives, J., dissenting) ("I can see no reason why a farmer should be afforded less protection in the barn where he actually does business, whether located within the curtilage or not, than is accorded a city dweller in his office"); *Janney* v. *United States*, 206 F. 2d 601, 603 (CA4 1953) (the defendant's barn was protected because "the [Fourth] Amendment extends not only to the dwelling house of a defendant, but also to the structures used by him in connection with his . . . place of business"); *United States* v. *Broadhurst*, 612 F. Supp. 777, 790 (ED Cal. 1985) (the argument "that farmers or other citizens living and working in rural settings . . . are not protected in their business enterprises by the Fourth Amendment to the same degree as their urban counterparts" could not prevail); *Norman* v. *State*, 379 So. 2d 643, 647 (Fla. 1980) (the defendant's "barn, as an integral part of petitioner's farming business, enjoyed the same fourth amendment protection as do other business premises").

[6] The usual manner of deciding whether intrusions on land near a dwelling are reasonable is to determine whether an officer is within the curtilage or in the open fields. It is plain that the open fields doctrine is not properly applied to land which has been developed. See *Oliver*, 466 U. S., at 180, n. 11, and 178 (emphasis added) ("It is clear . . . that the term 'open fields' may include *any unoccupied or undeveloped area* outside of the curtilage." "[A]n individual may not legitimately demand privacy for activities conducted *out of doors in fields*"); see *id.*, at 196 (MARSHALL, J., dissenting) ("[W]e may now expect to see a spate of litigation over the question of how much improvement is necessary to remove private land from the category of 'unoccupied or undeveloped area' to which the 'open fields exception' is now deemed applicable").

*Katz* v. *United States*, 389 U. S. 347 (1967), this Court has applied the Fourth Amendment whenever "the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith* v. *Maryland*, 442 U. S. 735, 740 (1979). This is a two-part inquiry. First, the individual must exhibit a subjective expectation of privacy in the object of the challenged search. See *Smith* v. *Maryland*, *supra*, at 740.[7] Dunn has met this standard. See *supra*, at 312.

Second, "the expectation [must] be one that society is prepared to recognize as 'reasonable.'" *Katz, supra,* at 361 (Harlan, J., concurring). For a homeowner to preserve Fourth Amendment protection in the area immediately surrounding the residence, he or she must not conduct an activity or leave an item in the plain view of those outside that area. The occupant of a commercial building must take the *additional* step of affirmatively barring the public from the area because a business operator has a reasonable expectation of privacy only in those areas from which the public has been excluded.[8] When a business or commercial structure is not open to the public,

> "[a]pplication of the *Katz* justified-expectation-of-privacy test . . . requires consideration of where the police were at the time of surveillance and how the surveillance was conducted. If police using the naked eye or ear are able to see or hear while located on adjoining

---

[7] The Court has noted that in some situations the absence of any subjective expectation of privacy would not defeat an individual's Fourth Amendment claim. See *Smith* v. *Maryland*, 442 U. S., at 740. See also Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 384 (1974).

[8] This requirement comports with the Court's usual view of the relationship between commercial premises and the Fourth Amendment. The Government must obtain a search warrant only when it wishes to search those areas of commercial premises from which the public has been excluded. See *See* v. *City of Seattle, supra,* at 545. See also Comment, 46 U. Pitt. L. Rev., at 815, n. 113.

property or even on property of the business which is readily accessible to the general public, this is not a search. . . .

"On the other hand, if the police engage in a much more intense form of surveillance, especially from places not ordinarily used by the public, this is a search under Katz." 1 W. LaFave, Search and Seizure § 2.4 (b), pp. 433–434 (2d ed. 1987) (emphasis added; footnotes omitted).[9]

See *Norman* v. *State,* 379 So. 2d 643, 647 (Fla. 1980) (petitioner had a reasonable expectation of privacy in his barn because the "barn, as an integral part of petitioner's farming business, enjoyed the same fourth amendment protection as do other business premises" and because he "took overt steps to designate his farm and barn as a place not open to the public").

The Court applied this distinction between protected commercial premises (from which the public is excluded) and unprotected commercial premises (to which the public has access) in its analysis last Term in *Dow Chemical Co.* v. *United States,* 476 U. S. 227, 237–238 (1986). In that case the Court held that "EPA's aerial photography of petitioner's 2,000-acre plant complex without a warrant was not a search under the Fourth Amendment." *Id.,* at 229. In so holding, the Court emphasized that "the narrow issue raised" was the lawfulness of observation "*without* physical entry" and that "[a]ny actual physical entry by EPA into *any enclosed area* would raise significantly different questions." *Id.,* at 237 (emphasis added). For that reason, the Court deter-

---

[9] For example, in *Commonwealth* v. *Soychak,* 221 Pa. Super. 458, 462–463, 289 A. 2d 119, 122–123 (1972), a police officer, suspicious that gambling activities were taking place inside a certain club, climbed onto the roof of a building and peered through the louvers of a ventilating fan. The court held that despite the fact that the club had "failed to completely block the view of police investigators," its operators nonetheless possessed a reasonable expectation of privacy.

mined that the question of invasion of the so-called "business curtilage" was not presented. *Id.*, at 239, n. 7.[10]

Looking into a building from a vantage point inaccessible to the public—here by climbing over the "substantial" wooden fence enclosing the front of the barn to intrude on Dunn's farmyard—is an unacceptable invasion of a reasonable privacy interest. When, as here, the public is excluded from an area immediately surrounding or adjacent to a business structure, that area is not—contrary to the Court's position—part of the open fields. "[O]ccupants of business and commercial premises should not be put to the choice of taking extraordinary methods of sealing off those premises or else submitting to unrestrained police surveillance." 1 LaFave, *supra*, at 434.[11]

---

[10] Cf. *Air Pollution Variance Bd. of Colo.* v. *Western Alfalfa Corp.*, 416 U. S. 861, 865 (1974) (inspector's entry onto corporation land to make an opacity reading of emissions of corporate smokestacks was not a search because the inspector was *not* "on premises from which the public was excluded" and "sighted what anyone in the city who was near the plant could see in the sky—plumes of smoke").

[11] It matters little if this protected area is denominated a "business curtilage" or if the Court holds that the business occupant has a reasonable expectation of privacy there. An area was historically considered part of the curtilage only if used for domestic purposes because the Fourth Amendment was thought to protect only the " 'sanctity of a man's home and the privacies of life.' " *Oliver*, 466 U. S., at 180 (quoting *Boyd* v. *United States*, 116 U. S. 616, 630 (1886)). Now that it is plain that commercial buildings, too, are covered by the Fourth Amendment, there is no reason to restrict the application of the curtilage concept to areas surrounding dwellings and used only for domestic purposes. See Comment, 46 U. Pitt. L. Rev., at 816.

In *United States* v. *Swart*, 679 F. 2d 698 (CA7 1982), for example, the Court of Appeals utilized both a "business curtilage" concept and a *Katz* reasonable expectation-of-privacy analysis to hold that the warrantless search of business premises violated the Fourth Amendment. In that case, police officers searched the area surrounding a garage and sheds that constituted a business for repairing and rebuilding cars and trucks. The court held that the search violated the Fourth Amendment because the cars "may have been within the curtilage of the business buildings," and

A barn, like a factory, a plant, or a warehouse, is a business place not open to the general public. Like these other business establishments, the barn, and any area immediately surrounding or adjacent to it from which the public is excluded, should receive protection. A business operator is undisputably entitled to constitutional protection *within* the premises when steps have been taken to ensure privacy. It is equally clear that he or she is entitled to protection in those areas immediately surrounding the building when obvious efforts have been made to exclude the public.[12]

## IV

The Fourth Amendment prohibits police activity which, if left unrestricted, would jeopardize individuals' sense of security or would too heavily burden those who wished to guard their privacy.[13] In this case, in order to look inside respondent's barn, the DEA agents traveled one-half mile off a public road over respondent's fenced-in property, crossed over three additional wooden and barbed wire fences, stepped under the eaves of the barn, and then used a flashlight to peer through otherwise opaque fishnetting. For the police habitually to engage in such surveillance—without a warrant—is constitutionally intolerable. Because I believe that farmers' and ranchers' expectations of privacy in their barns

because the occupant of the premises had a reasonable expectation of privacy in the cars located on his property which "was not diminished by the fact that the cars were on closed business premises." 679 F. 2d, at 702.

[12] When a rural business structure such as a barn is also located within the curtilage of a farm residence, there is plainly a substantial likelihood that the business enterprise is also closely related to domestic life. This fact compounds the need for the court to protect the individual's expectation of privacy in the business structure. See *United States* v. *Broadhurst*, 612 F. Supp., at 790, n. 11.

[13] As Professor Amsterdam has observed, "[t]he question is not whether you or I must draw the blinds before we commit a crime. It is whether you and I must discipline ourselves to draw the blinds every time we enter a room, under pain of surveillance if we do not." Amsterdam, *supra* n. 7, at 403.

and other outbuildings are expectations society would regard as reasonable, and because I believe that sanctioning the police behavior at issue here does violence to the purpose and promise of the Fourth Amendment, I dissent.