**AMERICAN SAMOA GOVERNMENT, Plaintiff**

**v.**

**MEALOFA TAUOA, Defendant**

High Court of American Samoa
Trial Division

CR No 74-97

April 28, 1998

Before RICHMOND, Associate Justice, TUA`OLO, Associate Judge, and AFUOLA, Associate Judge.

Counsel: For Plaintiff, John N. Cassell, Assistant Attorney General
For Defendant, Tautal A.F. Faalevao, Public Defender

## AMENDED ORDER DENYING MOTION TO SUPPRESS

Plaintiff American Samoa Government ("ASG") has charged defendant Mealofa Tauoa (Tauoa) with unlawful production of the controlled substance of marijuana and with unlawful possession of the controlled substance of marijuana. Tauoa now moves to suppress evidence on the basis that such evidence was the product of an unreasonable search and seizure and an unlawful arrest.

**Facts**

Early in the afternoon of November 22, 1997, Special Agent David Snow ("Snow") of the Drug Enforcement Unit within ASG's Department of Public Safety received a telephone call from Ponapati Poleki ("Poleki"), the *pulenu'u* (or mayor) of the village of Fagaitua. Poleki had discovered what he believed to be marijuana plants growing in styrofoam cups, on the mountainside near his home. He had taken two of the cups from the mountain and had them in his possession.

Snow met Poleki at his home in Fagaitua about an hour later. They were joined by Special Agent Eteuati Leiato ("Leiato"), also a Fagaitua resident. Poleki showed the two cups to the agents and said that there were 48 more up on the mountainside. The agents recognized the young plants in the cups as marijuana plants and decided to take a look at the area Poleki had described. They did not attempt to obtain a search warrant for the area.

Poleki led the agents along a trail leading from his house to a ridge on the mountainside. This walk took them about 15 minutes. They continued just beyond the ridge and entered a clearing in the brush. The clearing was about 15' x 15' and contained a shelf or table made from tree branches and wood. On the table the agents observed 48 more styrofoam cups containing what they recognized as juvenile marijuana plants. The agents also observed a five gallon bucket of fresh water, fertilizer, and a

tray wrapped with screening material.

As they were observing this scene, the agents and the *pulenu'u* heard a person coming up the hill through the brush. The person was approaching the clearing opposite the side from where they had entered. Leiato recognized the person as Tauoa and called out to him. Tauoa admitted to Leiato that the plants and other items in the clearing were his property, but he then denied to Snow any personal connection to these items. Tauoa was then arrested without an arrest warrant, and the plants and other items were taken as evidence.

Tauoa resides in a house 180 to 200 feet downhill from the clearing where the evidence was seized. He lives there with his father, mother, a brother, and a sister, her husband and their three minor children. No structures are visible from the clearing, and the house can only be seen after coming downhill about 10 to 15 yards. Tauoa's father holds the Muagututia *matai* (or chief) title, and both the house and clearing are located on the Muagututia family's communal land. The family uses the area within and about the clearing only for agricultural purposes. The six adult members of the household tend to the communal land surrounding the house and can authorize others to enter the land.

### Discussion

Article I, § 5 of the Revised Constitution of American Samoa guarantees the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." This provision mirrors the Fourth Amendment of the United States Constitution. The Revised Constitution of American Samoa also provides that "[e]vidence obtained in violation of this section shall not be admitted in any court."

Thus, individuals have a constitutional expectation of privacy in their "persons, houses, papers, and effects," and generally, law enforcement officers must obtain a warrant to search these areas or for these things. Snow and Leiato seized the evidence without a search warrant. There are, however, established exceptions to the warrant requirement. ASG contends that the evidence is admissible because it was discovered under the "open fields" exception to the constitutional restriction on search and seizure. Tauoa argues that the clearing was within the curtilage of his home, and thus falls within the protections against unlawful search and seizure.

In *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), the Supreme Court first recognized the open fields doctrine. "[T]he special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to

83

the open fields. The distinction between the latter and the house is as old as the common law." *Id.* at 59. The Court later defined the distinction between "curtilage" and "open fields" and emphasized that curtilage has been considered part of the home itself for Fourth Amendment purposes. *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 2735, 80 L.Ed.2d 214, 225 (1984). "At common law, the curtilage was 'the area to which extends the intimate activity of a man's home and the privacies of life.'" *Id.,* quoting *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

■■■ The Supreme Court has developed a four part test for determining the extent of curtilage, but has emphasized that the test should not be a bright line rule. The four factors instead should be considered under the umbrella of the general principles of the Fourth Amendment. The four factors are: (1) the proximity of the area to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by. *United States v. Dunn,* 480 U.S. 294, 301, 107 S. Ct. 1134, 1139, 94 L.Ed.2d 326, 334-35 (1987). "[T]hese factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.,* 480 U.S. at 301. The overriding general principle is whether government intrusion into the area in question infringes upon both the personal and societal values of privacy protected by the Fourth Amendment. "The Amendment does not protect the merely subjective expectation of privacy, but only expectation[s] that society is prepared to recognize as reasonable." *Oliver,* 466 U.S. at 177, quoting *Katz v. United States,* 389 U.S. 347, 361, 88 S. Ct. 507, 19 L.Ed.2d 576, 588 (1967) [inner quotes omitted].

■■ The Supreme Court has made it clear that an "open field" does not have to be "open" or a "field." In *Oliver,* for example, the Court found that a thickly wooded area may be an open field as that term is used in construing the Fourth Amendment. *Oliver* at 180, 225 n. 11, citing *United States v. Pruitt,* 464 F.2d 494 (9th Cir. 1972) and *Bedell v. State,* 521 S.W.2d 200 (Ark. 1975). In addition, steps taken to protect the privacy of an area do not necessarily mean that the expectation of privacy is a legitimate one. For example, in *United States v. Burton,* 894 F.2d 188 (6th Cir. 1990), a search in open fields was upheld, even though the police passed "no trespassing" signs and climbed over a fence and locked gate, because the defendant did not have a reasonable expectation of privacy, protected by the Fourth Amendment, in open fields.

This court has not previously examined the distinction between curtilage and open fields. We have, however, addressed motions to suppress evidence in similar fact situations. In companion cases, *American Samoa Gov't v. Atafua*, 1 A.S.R.3d 174 (Trial Div. 1997), and *American Samoa Gov't v. Dunham*, 1 A.S.R.3d 176 (Trial Div. 1997), the defendants sought to suppress evidence of plants believed to be marijuana that were seized from bush land. The court found that the defendants had neither asserted nor demonstrated that they personally had property or possessory interests in the bush land on which the marijuana plants were discovered. Lacking sufficient information of the defendants' legitimate expectation of privacy in the searched area, the court concluded that the defendants' constitutional rights had not been violated and denied the motions to suppress the evidence.

We find that the land at issue, where the marijuana and related items were seized, is not within the curtilage of Tauoa's home. The clearing instead falls within the definition of an open field and thus does not come within the special protections of Article I, § 5. Tauoa had no legitimate expectation of privacy in the area where the evidence was seized. We reach this conclusion by applying the four factors outlined in *Dunn* and the general overriding principles of Article I, § 5 to the area of land at issue, in light of the custom and norms of American Samoa.

The first factor in the *Dunn* curtilage test is the proximity of the area to the home. Testimony shows that the clearing is about 180 to 200 feet from the home where Tauoa lived. More importantly, however, the clearing cannot be seen from the home, nor the home from the clearing. It is not apparent when standing in the clearing to whom the land belongs.

The second factor in the test is whether the area is included within an enclosure surrounding the home. The clearing is accessible from several directions and is not within any enclosure surrounding the home. In *Suani v. American Samoa Gov't*, 1 A.S.R.3d 28, 31 (App. Div. 1997), the court stated, "American Samoa's habitable land is largely composed of communally held real property without fences or rigid boundaries." Given this nature of land in American Samoa, the second factor of the *Dunn* test may even have less significance here in defining curtilage than it would elsewhere. The issue in *Suani* was whether the evidence was sufficient to establish the defendant possessed the marijuana, not whether the police were properly upon the land in question, or whether the police could seize the marijuana without a warrant. If anything, "communally held real property without fences or rigid boundaries," would give rise to a lesser expectation of privacy than when the property is under the control of an individual person.

85

■ The third factor in the test is the nature of the uses to which the area is put. Tauoa asserts that the clearing, being situated within the *tuamaota* or *tualaoa* (or the extension of the home for family uses), is integral to Samoan custom and thus is so connected with the house as to fall within the definition of curtilage. Tauoa's argument, however, is not persuasive as to why playing a particular role in Samoan custom gives rise to a societal expectation of personal privacy for that type of land, especially considering the communal aspects of Samoan society. The clearing has been used only for cultivation. Cultivation, even of crops integral to traditional Samoan culture, is not a use that has a reasonable societal expectation of privacy. "There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops that occur in open fields." *Oliver,* 466 U.S. at 179.

The fourth factor in the test is the steps taken by the resident to protect the area from observation by people passing by. Other than locating the clearing in the bush on the mountainside, Tauoa did not take any steps to protect the area from observation. Snow and Leiato were able to reach the clearing in just over 15 minutes from another individual's home, along a path that had no connection to Tauoa's home. Tauoa's father had given authority to the five other adult residents of his household, including Tauoa, to give permission for outsiders to enter the land.

Finally, we look at the totality of these four factors under the overriding general principle of whether government intrusion into the clearing infringes upon the personal and societal standards of privacy protected by Article I, § 5. We find that the clearing where the evidence was seized is not the type of area where individuals would reasonably expect to be free from government intrusion.

■ Considering all of these factors, the land at issue is not curtilage. Thus, the clearing does not fall within the definition of "houses" in Article 1, § 5 of the Revised Constitution of American Samoa, and is not afforded the special protections of that section. The law enforcement officers' intrusion into the clearing and the resulting seizure of evidence in the clearing did not violate Tauoa's constitutional rights.

■ Tauoa also seeks to suppress the evidence on the grounds that Tauoa was unlawfully arrested without an arrest warrant. A.S.CA. § 46.0805 provides that:

> A police officer is authorized, and it is his duty, to make an arrest without a warrant, in the following cases: (1) when a felony is committed in his presence . . . (3) of persons found near the scene of a felony and suspected of committing it, where such suspicion is based on reasonable grounds and the

arrest follows the crime by a short time; . . .

Snow and Leiato were witnessing what they had reasonable grounds to believe was the unlawful production of the controlled substance of marijuana. Production of marijuana is a felony. Tauoa came upon the scene and spontaneously admitted, when asked immediately prior to his arrest, to owning the growing marijuana. Snow and Leiato had reasonable grounds to suspect Tauoa of committing a felony. Thus, Snow and Leiato could, under either A.S.C.A. § 46.0805(1) or § 46.0805(3), lawfully arrest Tauoa without a warrant. *See American Samoa Gov't v. Gotoloai,* 23 A.S.R.2d 65, 66-69 (Trial Div. 1992); *American Samoa Gov't v. Taylor,* 19 A.S.R.2d 105, 106-07 (Trial Div. 1991). We need not go further with this analysis. The seizure of evidence was not tainted, and this evidence will not be suppressed, on account of Tauoa's warrantless arrest.

## Order

Tauoa's constitutional rights under Article I, § 5 of the Revised Constitution of American Samoa were not violated either by the law enforcement officers' intrusion into the clearing and seizure of evidence there without a search warrant, or by their arrest of Tauoa without an arrest warrant. The motion to suppress evidence is therefore denied.

It is so ordered.