792 A.2d 1124

**Bruce Wayne KOENIG**

v.

**STATE of Maryland.**

**No. 47, Sept. Term, 2001.**

Court of Appeals of Maryland.

Feb. 21, 2002.

Reconsideration Denied April 8, 2002.

Brian J. Murphy, Assigned Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner/cross–respondent.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent/cross–petitioner.

Argued Before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

PER CURIAM ORDER.

The petition for writ of certiorari in the above-entitled case having been granted and argued, it is this 21st day of February, 2002.

ORDERED, by the Court of Appeals of Maryland, that the writ of certiorari be, and it is hereby, dismissed with costs, the petition having been improvidently granted.

BELL, Chief Judge.

Dissenting Opinion from Dismissal of Petition for Certiorari as improvidently granted

This Court issued the writ of certiorari to consider the propriety of the ruling by the Court of Special Appeals that

the "loafing shed"[1] on petitioner Bruce Wayne Koenig's property "was not part of the curtilage of his house and that, therefore, the police did not need a warrant to enter and excavate a hole inside the shed looking for [the] bodies [of his parents]," whether "the police reasonably believed that [the] petitioner's wife had authority to consent to the search of [the] petitioner's 'cargo box' when the police had express knowledge to the contrary," and, conditionally, assuming the "loafing shed was within the curtilage, whether, because conducted pursuant to warrant, its ultimate search was valid. In so doing the Court acknowledged and, in fact, determined that it was "desirable and in the public interest" that these questions "be certified to it for review and determination." See Md. Code (———, ——— Replacement Volume) § 12–203 of the Courts and Judicial Proceedings Article. It now dismisses the petition, after briefing and oral argument, the majority concluding that it was improvidently granted. Under the facts and circumstances of this case, I cannot agree and, consequently, dissent.

The Court of Appeals has a responsibility to decide any case properly presented that meets the threshold criteria: presenting issues that it is desirable and in the public interest to decide. That responsibility, as to any issue, may be triggered by such considerations as novelty, complexity, conflicting precedents, impact or importance and the breadth or extent thereof and likelihood of recurrence.

Once a "cert" worthy case has been accepted on certiorari, there must be a compelling reason not to decide it; it really must have been improvidently granted. Black's Law Dictionary, Seventh Ed.1999, defines "improvident" as "of or relating to a judgment arrived at by using misleading information or a mistaken assumption." Thus, when certiorari has been granted to address a particular issue, there being no other

---

1. The investigating officer, a detective in the Frederick County Sheriff's Office, testified that a "loafing shed" is a roofed building enclosed on three sides which is "typically a shelter that's used to shelter animals on a farm."

"cert" worthy issue, and briefing and argument have disclosed that the issue for which certiorari was granted is not, in fact, presented by the case, need not, or cannot, be reached on the merits, then it is appropriate to dismiss the petition as improvidently granted.[2] In that case, certiorari will have been issued under the mistaken belief that the issue that was "cert" worthy was in the case. This is the basis of the dismissal of most of the cases this Court dismisses as improvidently granted. To be sure, even when the issue for which certiorari was granted remains in the case, dismissal as improvidently granted may still be appropriate. Subsequent events, such as legislative action, may render the issue less important or its impact less extensive, making the decision to await another case proper. Neither situation applies to the case sub judice.

As we have seen, the Court granted review of two questions presented by the petitioner and, depending on the resolution of one of them, the first, one question presented by the State. The petitioner's questions challenged the rulings by the Court of Special Appeals with respect to suppression issues. The first, in truth, the primary reason for the certiorari grant, involved defining the boundaries of the curtilage of a dwelling house and the second, the ability of a spouse under express instructions from the other spouse not to open a package, of which the police are aware, to consent to the search of that package. The facts in support of the petition for writ of certiorari demonstrate that both of these issues are, in fact, presented, that their viability and importance have not be diluted by subsequent events and that an issue subsumed in the first is a critically important one that should be addressed and decided.

---

**2.** The Court may issue the writ of certiorari before or after decision by the Court of Special Appeals. See Maryland Rule 8–302(a). Dismissal of the petition for writ of certiorari as improvidently granted is possible only when certiorari is granted after the decision by the Court of Special Appeals. Otherwise, the Court will be acting in lieu of the intermediate court in affording the appellant the one obligatory appeal to which any aggrieved litigant is entitled.

The petitioner was charged with the murder of his parents after an investigation of their disappearance by the Frederick County Sheriff's Department discovered their bodies buried on his property. Suspicion focused on the petitioner, who had recently moved back to Maryland after many years in Texas, when information developed from inquiries of family members and friends of the victims contradicted the story that the petitioner told concerning the victims's appearance. Rather than supporting a planned cross country trip, as the petitioner had told his siblings, the evidence the Sheriff's Department discovered suggested a sudden disappearance. Attention was also directed to the 12 acre wooded property, reachable only by a private road and a long driveway, recently purchased by the petitioner and on which the petitioner resided. Having visited the property and noticed the "loafing shed," which was within the ½ acre cleared area, approximately 71 feet from the house on the property, and subsequently learning that the petitioner had recently received a delivery of crushed stone, which was being spread over various parts of the property, including in the "loafing shed," a detective in the Sheriff's Department, without having obtained the petitioner's permission, brought a dog specially trained in the detection of dead bodies to the property and walked the dog over the property, starting in the wooded area and ending in the "loafing shed." When the dog alerted in the area of the "loafing shed," the police entered the "loafing shed" and dug a hole, uncovering a part of a dead body and the smell of decomposing flesh. Thereafter, they sought, and obtained a warrant, execution of which resulted in the recovery of the decomposing bodies of the petitioner's parents. The autopsy revealed that each had been shot in the head with a gun.

The petitioner shipped a "cargo box" by air to his wife in Texas. She gave her consent to the police to search the "cargo box." Before doing so, however, she informed the police that she had authority to "pick up the box from the airport, but not ... open it." Recovered from the "cargo box" were two suitcases containing personal papers and jewelry belonging to the petitioner's parents.

In his petition for writ of certiorari, the petitioner noted that the Court of Special Appeals ruled, relying on *State v. Martin*, 553 A.2d 1264, 1264 (Me.1989) ("shed [that] 'appeared to be a shanty for animals to get in and out of the weather,' a 'horse hovel' " was not within the curtilage), that the "loafing shed" "was used for agricultural purposes," and not put to domestic use. Challenging that ruling, he offered facts supportive of the "loafing shed" being within the curtilage: that it was in the cleared area, that it was only 71 feet from the house and that the house, and therefore, the "loafing shed," was reachable only by private road. In addition, the petitioner argued that there was no evidence that the shed was used for agricultural purposes. Moreover, he noted the existence of, and cited, authority contradicting that relied on by the intermediate appellate court and holding that outbuildings, including sheds, barns, garages, are within the curtilage.

The petitioner also argued;

". . . [T]he Court of Special Appeals did not even address a second argument advanced by Petitioner both in his brief and at oral argument—that the facts in *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), the leading Supreme Court case on the curtilage question and one on which the Court of Special Appeals relied, were significantly different from the instant facts and that, therefore, the police conduct countenanced in *Dunn*, supra, was significantly less egregious than that which occurred in the instant case. In Dunn, supra '[t]he officers walked under the barn's overhang to the locked wooden gates and, shining a flashlight through the netting on top of the gates, peered into the barn.... The officers did not enter the barn." *Dunn*, supra at 298, 107 S.Ct. 1134. Thus, the Supreme Court said, "the officers' use of the beam of a flashlight, directed through the essentially open front of respondent's barn, did not transform their observations into an unreasonable search and seizure within th meaning of the Fourth Amendment." *Dunn*, supra. at 305, 107 S.Ct. 1134. In stark contrast, in the instant case, the police did much more than peer into the loafing shed without entry and then go

and seek a warrant—the police entered and excavated the floor of the shed through a layer of crushed stone and then through dirt until they unearthed a body. Only after this discovery of exactly what they came looking for did the police deign to secure a warrant to grant an imprimatur for their already completed activities.

"The ruling of the Court of Special Appeals sets a dangerous precedent in this case of first impression in this state. Besides ignoring substantial and well reasoned precedent from other states on the curtilage question, the Court of Special Appeals failed to limit the scope of what the police can do in searching non-curtilage areas of a person's property. The instant case condoned an excavation for bodies but did not place any future limits on police conduct in that area, no matter how intrusive or even shocking. Review by this Court is therefore desirable and in the public interest."

The same arguments, albeit somewhat more expansively, were made in the petitioner's brief. With respect to the pure curtilage issue, the petitioner expanded upon the unauthorized and unconsented to police entry on his property, noting that it occurred on three occasions prior to the discovery of the bodies.[3] He also offered additional facts to support the argument that the shed was a part of the curtilage: the shed could not be seen from the roadway and there was a no trespass sign on the property. The petitioner concluded that the Dunn four factor test was misapplied by the intermediate appellate court, it having placed dispositive emphasis on "the nature of the uses to which the area is put." *Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134, 1140, 94 L.Ed.2d 326, 335 (1987).

The petitioner also repeated his lament that the Court of Special Appeals failed to address the boundaries of police

---

**3.** On the first occasion, finding no one at home the officer remained on the property for about 15–20 minutes, walking through the garage area and observing the "loafing shed" and its environs. On the second, again no one being at home, the officer was there to "get a feel for where the property was." On that occasion, he again looked at the "loafing shed" and its contents. It was on the third occasion that the cadaver dog was brought to the property.

conduct in "open fields," on private property that does not fall within the curtilage. Relying on Wayne R. LaFave, Search and Seizure, § 2.4(a) at 529–30 (3rd ed.1996) for the proposition that "non-curtilage intrusions that have been allowed usually involved only some form of sensory snooping occasionally accompanied by a minor physical entry," he concludes:

" . . . [E]ven if the Court of Special Appeals was correct in its finding on the curtilage issue, which it was not, it would still be a Fourth Amendment violation to enter Petitioner's shed without a warrant and dig a hole in the ground in search of evidence. After all, the Supreme Court tells us, 'the touchstone of the Fourth Amendment is reasonableness.' *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), citing *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The conduct of the police in this case was simply not reasonable; accordingly, the judgment of the Court of Special Appeals must be reversed."

The State understood and responded, not simply to the petitioner's pure curtilage argument, but also to his open fields argument. With regard to the former, it spent eleven pages analyzing the *Dunn* test and its applicability to the case sub judice and explaining why the "loafing shed' " was not within the curtilage. The State spent six pages addressing the open fields doctrine. Indeed, the State concluded, "the critical inquiry is whether the loafing shed falls under the open fields doctrine or whether it was within the curtilage."

The same analysis applies with respect to the consent issue. There simply is no doubt that it was raised and argued in the petition for writ of certiorari and then argued more expansively in the petitioner's brief. And, as in the case of the curtilage issue, the State responded to that·argument at great length.

. From the foregoing, it is clear that the issue of whether the "loafing shed" was within the curtilage was presented, and argued, in the petitioner's petition for writ of certiorari and remained viable after briefing and argument. So, too, was the petitioner's second argument, that non-curtilage property en-

joys Fourth Amendment protection, that searches of such property may not be conducted with impunity.

No misleading information was provided on the curtilage issue, the State certainly does not so contend, and there is, therefore, no basis for believing that the grant of certiorari to review this issue was based on a mistaken assumption. Nor has subsequent events rendered the issue less important or reduced its impact. But assuming that the dismissal of the petition as to the status of the "loafing shed" could be justified on the basis of improvidence,[4] that would leave for decision the petitioner's second argument and the consent issue, neither of which is dependent for its viability on the "loafing shed" being outside the curtilage. Indeed, the open fields issue becomes an issue only if the curtilage issue is decided in the State's favor.

This Court issued the writ of certiorari after decision by the Court of Special Appeals. Consequently, we were not obliged to accept all of the questions presented for review; we could take for review only those that were independently "cert" worthy. That is precisely what we did. To be sure, the open fields issue was included as a part of the curtilage argument. That is as it should be, for the boundaries, for Fourth Amendment purposes, of non-curtilage property is logically and analytically related to the question of what property is included in curtilage. That does not mean, however, that the questions are inextricably intertwined, so that the decision in one is dispositive of the other. In fact, the opposite is true,

---

4. The only rationale that presents even a plausible basis for the dismissal of the petition as to the pure curtilage issue is the State's argument, quoting *Wilkes v. State,* 364 Md. 554, 569, 774 A.2d 420, 429 (2001) ("We extend great deference to the fact finding of the suppression court and accept the facts as found by the court unless clearly erroneous."), that the issue is a fact-based one and that great deference must be given the trial court's first level fact finding. As Wilkes recognizes, "When the question before us is whether a constitutional right has been violated, we are required to make our own independent constitutional appraisal by applying the law to the facts of the particular case." *Carroll v. State,* 335 Md. 723, 736, 646 A.2d 376, 383 (1994). See *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990).

the open fields question need be resolved, reached, only if the property is not within the curtilage and, thus, constitutes "open fields." The question, in other words, has an independent existence, relevance, impact and importance.

The independent existence, relevance, impact and importance of that aspect of the curtilage issue that questions the need for limitations on the State conducted searches of private non-curtilage property make the issue "cert" worthy in its own right. This is particularly the case here, where the intrusiveness of the police is significantly more extensive than in those cases in which the Supreme Court of the United States considered the open fields doctrine and determined, under the facts and circumstances of those cases, that the trespass did not render the search and seizure without a warrant unreasonable, see *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984); *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), upon which the State places heavy reliance; here, rather than a technical or minor trespass, the police conducted a kind of excavation in search of evidence and it did so not only without getting a warrant, but after multiple trespasses. Indeed, because the precedents in this area do not involve facts like in the instant case, in which the ownership of the property was all but disregarded,[5] this issue's importance and, hence, "cert" worthiness, very likely exceeds that of the curtilage issue.

Having demonstrated the "cert" worthiness of the open fields doctrine issue, I am hard pressed to discern the basis on which the majority has determined that it was improvidently granted. As indicated and demonstrated, it was presented, straightforwardly, in the "cert" petition and again in the brief.

---

5. As we have seen, the police came onto the petitioner's property uninvited and without consent on at least three occasions. To be sure, a police officer may enter premises to conduct an investigation and to speak with the owner of property, however, in this case, when it was learned that no one was at home, he stayed on the premises looking around for 15 to 20 minutes. He returned to get a feel for where the property was and, later, to have a dog trained in the discovery of dead bodies walk the property.

It was argued extensively by the State that the dichotomy between curtilage and open fields was dispositive, that anything goes on private property that is not within the curtilage, the Fourth Amendment applying only to the curtilage, the direct opposite of the petitioner's argument. Certainly, the novelty of the issue, the very factor that makes the case "cert" worthy, does not suffice; believing that the matter would not be reached because of assumptions made about the threshold issue, in this case, whether the "loafing shed" is within the curtilage, is not a basis, so long as the matter remains viable even when the threshold issue is resolved or avoided, whichever the case may be.

I have similar concerns with respect to the consent issue. As with the curtilage issue, it has independent "cert" worthiness; there is no interrelationship between the curtilage issue and the consent issue such that resolution of one resolves the other or renders it moot. I can discern no basis for the dismissal of the consent issue.

On the morning that this case was heard, a young lawyer spent the first part of her argument thanking the Court for taking the case that she was arguing as the petitioner. At great length, she spoke of the importance of the issue, the complexity and the need for resolution for the guidance of bench and bar and, again, expressed her gratitude that the Court had granted certiorari to review it. Being of the view that there was no reason for the attorney to thank the Court for doing what it is mandated to do, I interrupted her, offering a simple, but what I thought was, and still think is an, accurate, explanation for doing so: "That is what we do." Granting certiorari to consider and resolve some novel, difficult and complex issue and broadly relevant issue is indeed what we do. In fact, as the court of last resort in this State, charged, in addition with setting the legal policy, that is, it may be said, the Court's "raison d'etre." In this case, I fear that we have not justified to the people of this State, whom we are mandated to serve, our "raison d'etre." I dissent from the dismissal of the petition as improvidently granted.