# Order

**Michigan Supreme Court**
**Lansing, Michigan**

July 29, 2016

150906

PEOPLE OF THE STATE OF MICHIGAN,
          Plaintiff-Appellee,

v

MICHAEL ANDREW RADANDT,
          Defendant-Appellant.

_____/

Robert P. Young, Jr.,
Chief Justice

Stephen J. Markman
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Joan L. Larsen,
Justices

SC: 150906
COA: 314337
St Joseph CC: 12-017690-FH

On order of the Court, leave to appeal having been granted and the briefs and oral arguments of the parties having been considered by the Court, we VACATE our order of July 1, 2015. The application for leave to appeal the December 2, 2014 judgment of the Court of Appeals is DENIED, because we are no longer persuaded that the questions presented should be reviewed by this Court.

MCCORMACK, J. (*dissenting*).

I respectfully dissent from the majority's determination that leave to appeal was improvidently granted in this case. The analysis of the Court of Appeals majority is flawed in several critical ways, and this Court has yet to provide guidance to the lower courts on the framework for analyzing a "knock and talk" procedure since the United States Supreme Court's opinion in *Florida v Jardines*, 569 US ___; 133 S Ct 1409; 185 L Ed 2d 495 (2013). I would prefer to issue an opinion correcting the errors made by the Court of Appeals majority and clarifying the proper framework for such an analysis. I write to elaborate on my views.

## I.  FACTS AND PROCEDURAL HISTORY

In August 2011, St. Joseph County police officers received an anonymous tip that marijuana was being grown at the address of the defendant, Michael Radandt. Deputies Michael McCoy and Jeremiah Abnet visited the property. The defendant's house is in a rural area, with the front of the house facing the road to the west, the back of the house facing east, and a dirt or gravel driveway along the north side of the house. The driveway extends past the back of the house and leads to a barn. There are two doors on the north side of the house. The door closest to the road leads into an enclosed porch on the front of the house. The second door, the "middle door," abuts the driveway. There is a low wooden deck attached to the back of the house and a sliding glass door (the "back door") that leads onto the deck. On their August 2011 visit, the officers found no one at home and did not find evidence sufficient to provide probable cause for a search warrant.

In December 2011, the officers received another anonymous tip complaining of high traffic at the defendant's residence. As a result, Deputies McCoy and Abnet visited the property again. They pulled into the driveway, parked adjacent to the middle door, and knocked on that door. When no one answered, they walked east toward the backyard and around the corner of the house. There was a well-worn path through the grass leading to the back door. Deputy McCoy walked onto the deck and knocked on the back door. Standing in front of the back door, Deputy McCoy saw that the second-floor windows were covered with black plastic sheeting, observed a makeshift vent fan blowing air out of a second-floor window, and smelled marijuana. No one responded to the knock at the back door, and the officers left without making contact with any residents. The officers obtained a search warrant based on what they had observed while standing at the defendant's back door. Upon executing the search warrant, the officers discovered evidence of a marijuana grow operation.

The defendant was charged with manufacturing 20 to 200 marijuana plants, possessing a firearm during the commission of a felony, and maintaining a drug house. The defendant filed a motion to suppress the evidence found as a result of the executed search warrant, arguing that the police had developed probable cause for the warrant only after unlawfully entering the defendant's curtilage, and the trial court denied the motion. The defendant entered a conditional plea on December 28, 2012, and was granted a stay of sentence pending appeal.

On remand from this Court, the Court of Appeals affirmed the trial court's denial of the defendant's motion to suppress. The majority held that the officers were lawfully present in the defendant's backyard as part of their effort to make contact with someone in the home. *People v Radandt*, unpublished opinion per curiam of the Court of Appeals, issued December 2, 2014 (Docket No. 314337), p 4. Judge SHAPIRO dissented, concluding that the officers had exceeded the scope of a permissible "knock and talk" because they did not have an implied license to enter the defendant's backyard. *Id*. at 2 (SHAPIRO, J., dissenting). This Court granted the defendant's application for leave to appeal.

## II. ANALYSIS

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." US Const, Am IV. Likewise, the Michigan Constitution provides that "[t]he person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures." Const 1963, art 1, § 11. This Court construes the Michigan Constitution "to provide the same protection as that secured by the Fourth Amendment, absent compelling reason to impose a different interpretation." *People v Slaughter*, 489 Mich 302, 311 (2011) (quotation marks and citation omitted). "It is a basic principle of Fourth Amendment law that searches and seizures inside a

home without a warrant are presumptively unreasonable." *Payton v New York*, 445 US 573, 586 (1980) (quotation marks and citation omitted). When evidence is found within the curtilage of a home, "both the Fourth Amendment's and Michigan's constitutional prohibition[s] against unreasonable searches and seizures are applicable." *People v Custer*, 465 Mich 319, 326 n 2 (2001).

## A.  CURTILAGE

The Court of Appeals majority erred when it determined that the defendant's backyard was not part of the curtilage of his home. See *People v Radandt*, unpub op at 4. The area "immediately surrounding and associated with the home"—the "curtilage"—is "considered part of the home itself for Fourth Amendment purposes." *Oliver v United States*, 466 US 170, 180 (1984). When determining whether a particular area is part of the curtilage of a home, the primary consideration is "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *United States v Dunn*, 480 US 294, 301 (1987). Courts consider four factors—the *Dunn* factors—when making this determination:  "[1] the proximity of the area . . . to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." *Id*. at 301.

In this case, the area at issue is the part of the defendant's backyard immediately adjacent to his home, including the wooden deck affixed to the back of his home. This area is in immediate proximity to the home. The back door where the officers stood opens directly into the defendant's home. In *Jardines*, the Supreme Court described "the front porch" as "the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.' " *Jardines*, 569 US at ___; 133 S Ct at 1415, quoting *Oliver*, 466 US at 182 n 12. Like the front porch, the immediate backyard and back deck are classic examples of areas to which the activity of home life extends. They are "intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *California v Ciraolo*, 476 US 207, 213 (1986). They are commonly used for activities closely associated with the home, such as grilling and eating. While the area at issue in this case was not enclosed and the defendant had not taken other steps to protect it from observation by passersby, the area was not visible from the road and further privacy-enhancing steps were not necessary given the rural location of the home. And, contrary to the Court of Appeals majority's statement, "the fact that there was an observable path leading from the main entry to the rear sliding glass door" is not relevant to the question whether this area was curtilage. *Radandt*, unpub op at 4. The defendant's backyard where the officers walked and the back deck where they stood were certainly part of the defendant's curtilage.

## B.  SCOPE OF IMPLIED LICENSE

The Court of Appeals majority next held that, even if the area where the officers entered was part of the defendant's curtilage, "where officers are engaged in a knock and talk investigative procedure, they are not categorically excluded from entering the curtilage if circumstances make it reasonable to conclude that they might encounter the person being sought." *Radandt*, unpub op at 4. This holding is inconsistent with the analysis recently clarified by the United States Supreme Court in *Jardines*.

In *Jardines*, the Supreme Court reiterated that the Fourth Amendment "establishes a simple baseline . . . : When the Government obtains information by physically intruding on persons, houses, papers, or effects, a 'search' within the original meaning of the Fourth Amendment has undoubtedly occurred." *Jardines*, 569 US at ___; 133 S Ct at 1414, quoting *United States v Jones*, 565 US ___, ___ n 3; 132 S Ct 945, 950 n 3 (2012) (quotation marks omitted).[1] *Jardines* instructs that when officers physically enter and occupy the constitutionally protected area of the curtilage, the proper question is whether there was a license (implied or explicit) to do so. *Id*.

"[T]he knocker on the front door is treated as an invitation or license to attempt an entry" to a home. *Id*. at 1415, quoting *Breard v Alexandria*, 341 US 622, 626 (1951).

> This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. . . . Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." [*Jardines*, 133 S Ct at 1415-1416 (footnote omitted).]

*Jardines* held that the scope of this implied license is limited to approaching a home for a specific purpose.[2] *Jardines* further held that the scope of the implied license is also

---

[1] The *Jardines* Court emphasized that while *Katz v United States*, 389 US 347 (1967), added to this baseline by making clear that "property rights are not the sole measure of Fourth Amendment violations," *Katz* "does not subtract anything from the Amendment's protections when the Government *does* engage in [a] physical intrusion of a constitutionally protected area." *Jardines*, 569 US at ___; 133 S Ct at 1414 (internal quotation marks omitted) (emphasis and alteration in original).

[2] The *Jardines* Court concluded that the officers had exceeded the scope of the implied license by bringing a trained police dog onto the defendant's porch to conduct a search for drugs because "[t]here is no customary invitation to do *that*." *Id*. Because the officers gathered evidence by entering the defendant's curtilage to engage in conduct not explicitly or implicitly permitted by the homeowner, their conduct constituted a search within the meaning of the Fourth Amendment. *Id*. at ___; 133 S Ct at 1417.

limited to a particular area—the area where "any private citizen" might approach a home to knock on the door. *Id*. at 1416. In other words, the question is whether "any private citizen" approaching a defendant's house would behave as the officers did.[3] If the officers' conduct exceeded the scope of the implied license, the "knock and talk" procedure violated the Fourth Amendment. The Court of Appeals majority erred when it ignored this controlling standard.

The implied license "typically permits the visitor to approach the home by the front path" and knock on the front door. *Id*. at ___; 133 S Ct at 1415. This case presents a more challenging question given the unusual nature of the defendant's house; the uncontested evidence reveals that the defendant's home did not have a clear "front" door for use by public visitors. The United States Supreme Court has not decided "whether a police officer may conduct a 'knock and talk' at any entrance that is open to visitors rather than only the front door." *Carroll v Carman*, 574 US ___, ___; 135 S Ct 348, 352 (2014).

Because the scope of the implied license depends on how "any private citizen" approaching a home would behave, I would conclude that a member of the general public approaching a home would knock at the door that appears to be the public visitor entrance to the home. Where, as in this case, it is difficult to determine when approaching a home which of two entrances is the public visitor entrance, a member of the general public might approach and knock at either of those doors. In this case, the door on the side of the house facing the street was surrounded by an enclosed porch. Both the middle door and the back door led directly into the house. While the back door was not visible from the street, it was the first door that visitors would encounter as they approached the house if they drove fully into the driveway to park. Traffic patterns through the grass in the backyard made clear that the back door was regularly used.[4] No door had any indicia signaling that it was intended to be the public visitor entrance, such as a doorbell, door knocker, welcome mat, or wall-mounted mailbox. Because either door could have been the public visitor entrance, I would not conclude that the officers

---

The defendant in *Jardines* had conceded "the unsurprising proposition that the officers could have lawfully approached his home to knock on the front door in hopes of speaking with him." *Id.* at ___; 133 S Ct at 1415 n 1.

[3] "Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters." *Id*. at ___; 133 S Ct at 1415.

[4] Deputy McCoy testified that the "officers thought it was possible that [the back door] was the primary door" because "there was a lot of foot traffic to and from this door." This testimony was not controverted by any testimony or other evidence from the defendant.

exceeded the scope of the implied license when they approached the house and knocked on both doors with the hope that they might speak with a resident.

The Court of Appeals majority erred, however, when it held that the officers were entitled to proceed to another door because they believed that someone was home and had not responded to their knock on the first door. *Jardines* instructs that the habits of the country create the implicit license that allows officers to enter a person's curtilage. See *Jardines*, 569 US at ___; 133 S Ct at 1415. "At the [Fourth] Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Jardines*, 133 S Ct at 1414, quoting *Silverman v United States*, 365 US 505, 511 (1961).

> When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak. [*Kentucky v King*, 563 US 452, 469-470 (2011).]

Exercising the right to retreat into one's home and to decline to speak with the person knocking on the door does not give greater license to the person knocking to proceed to other areas of one's property. If a person has no obligation to open the door, it cannot be, as the Court of Appeals majority held, that his or her failure to do so grants the visitor a license to enter other areas of the curtilage. The scope of the implied license neither expanded nor contracted when the residents failed to answer the knock at the first door.

Further, while the presence of a fence is a factor to be considered when determining if an area is curtilage, see *Dunn*, 480 US at 301, the fact that a house has "no fence blocking entry into the backyard, and no signs indicating an intent to keep the public out," *Radandt*, unpub op at 3, is not an invitation to wander freely on someone's curtilage and does not expand the scope of the implied license.

Accordingly, while no injustice results from allowing the Court of Appeals result to stand, I would issue an opinion correcting the erroneous analysis of the Court of Appeals majority and providing guidance for the lower courts on the proper analysis of a "knock and talk" procedure post-*Jardines*. I therefore respectfully dissent from the order vacating our July 1, 2015 order and denying leave to appeal.

BERNSTEIN and LARSEN, JJ., join the statement of MCCORMACK, J.



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

July 29, 2016



Clerk

t0726