# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

DENNIS KEITH TOWNE,

       Defendant-Appellant.

UNPUBLISHED
December 19, 2017

No. 322820
Livingston Circuit Court
LC No. 12-020831-FH

## ON REMAND

Before: SERVITTO, P.J., and GADOLA and O'BRIEN, JJ.

PER CURIAM.

Defendant, Dennis Keith Towne, pleaded guilty to manufacturing marijuana, MCL 333.7401(2)(d)(*iii*), and was sentenced to two days in jail, with credit for two days served, and one year probation. We denied defendant's application for leave to appeal,[1] and defendant thereafter applied for leave to appeal before our Supreme Court, which remanded this matter for consideration as on leave granted.[2] In that appeal, defendant challenged the circuit court's order denying his motion to suppress evidence on Fourth Amendment grounds. We rejected those arguments and affirmed.[3] After we issued our opinion, the Michigan Supreme Court issued its opinion in *People v Frederick*, 500 Mich 228; 895 NW2d 541 (2017). Defendant appealed our opinion to the Michigan Supreme Court, and in lieu of granting leave to appeal, the Supreme Court vacated our opinion and remanded this case for reconsideration in light of *Frederick*. *People v Towne*, ___ Mich ___; 902 NW2d 419 (2017). We conclude that *Frederick* does not change our initial decision, and we again affirm.

## I. BACKGROUND

---

[1] *People v Towne*, unpublished order of the Court of Appeals, entered September 17, 2014 (Docket No. 322820).

[2] *People v Towne*, 497 Mich 1026; 863 NW2d 57 (2015).

[3] *People v Towne*, unpublished per curiam opinion of the Court of Appeals, issued March 10, 2016 (Docket No. 322820), vacated and remanded ___ Mich ___; 902 NW2d 419 (2017).

As summarized in our previous opinion, the facts of this case are as follows:

On December 15, 2011, Michigan State Police (MSP) Trooper Joseph Allen Pendergraff went to defendant's residence to execute an arrest warrant for defendant's son, Richard Keith Towne. While, according to defendant, Richard did not live at the residence, Pendergraff had learned a variety of information, including the fact that there was a vehicle at defendant's residence that was registered in Richard's name, the fact that Richard received mail at the residence, and other similar information, that led him to believe that Richard was, in fact, residing at defendant's residence on and before that date. Pendergraff, accompanied by MSP Trooper Adam Henderson, approached the residence's front door, knocked, was greeted by defendant, and asked to search the residence to find and arrest Richard. During Pendergraff's and Henderson's interactions with defendant, MSP Troopers Matthew Keller and Michael Sura approached the back of the residence in hopes of preventing Richard from escaping.

As defendant opened the door, he did so "just enough to slide out and then . . . closed the door immediately behind him" before greeting the troopers. This odd behavior, coupled with the information described above, led Pendergraff to believe that Richard was, indeed, in defendant's residence. Pendergraff also learned that a second vehicle at defendant's residence was also registered in Richard's name during the conversation. Eventually, Pendergraff asked permission to enter defendant's residence, and defendant denied that request. In light of defendant's odd behavior as well as the additional information described above, Pendergraff believed that Richard was in the residence and that there was probable cause to search the residence. Pendergraff and Sura then left the residence to obtain a search warrant for Richard in defendant's residence. Keller and Henderson, however, remained near the residence to be available in the event that Richard attempted to flee.

Specifically, Henderson walked to and stood approximately "20 yards, 25 yards" from the residence, "ten twenty feet" from a pool located on defendant's property, and "[l]iterally right on the tree line" "almost in the forest" while observing defendant's residence. After remaining in this location for approximately 45 or 50 minutes, Henderson observed what he described as an "overwhelming" and "extensive amount of smoke coming out of the chimney[.]" He explained that the smoke smelled of an "extremely excess amount of freshly burned marijuana." Through the residence's many uncovered windows, he also observed the living room area of the residence "getting brighter and brighter" "from a fire." He testified that the fire "illuminated not only the whole [living] room, but the kitchen portion, the hallway, it was extremely intense." As the rooms grew brighter Henderson continued, "more smoke came out of the chimney" and "you could actually see sparks coming out of the chimney." According to Henderson, he had "never had a scent of marijuana be so overwhelmingly strong" in his 13-year career.

Fearing that individuals in the residence were attempting to destroy evidence, i.e., burning marijuana, the troopers approached the back of the residence and, through the uncovered windows, saw defendant "literally shoveling . . . handfuls of marijuana from a plastic tote . . . onto the fire." Henderson and Keller contacted Pendergraff, and all agreed that they should enter the residence to secure the evidence that was being destroyed. Henderson and Keller did so, first securing the residence to ensure that they were not ambushed by defendant, defendant's wife, or Richard, and, second, securing the unburned marijuana. In light of these developments, Pendergraff instead sought and obtained a marijuana-related search warrant. The troopers executed the same and found "a total of 75 growing marijuana plants" and numerous "bags of marijuana" that "weighed 9.04 pounds." Defendant was thereafter charged with one count of manufacturing marijuana. He moved both before the district court and circuit court to suppress the marijuana evidence and dismiss the case on Fourth Amendment grounds, but his motions were denied. Thereafter, he pleaded guilty, expressly preserving his Fourth Amendment challenge, and was sentenced as described above. This appeal followed. [*Towne*, unpub op at 1-2 (alterations in original).]

On remand, we must address whether defendant's challenges the circuit court's order denying his motions to suppress and dismiss on grounds that the evidence was obtained in violation of the Fourth Amendment are meritorious in light of *Frederick*. We hold that they are not.

## II. APPLICABLE LAW

### A. STANDARD OF REVIEW

A circuit court's factual findings at a suppression hearing are reviewed for clear error, but its application of the underlying law and ultimate decision are reviewed de novo. *People v Slaughter*, 489 Mich 302, 310; 803 NW2d 171 (2011).

### B. FOURTH AMENDMENT PROTECTIONS

"The Fourth Amendment protects people from unreasonable searches and seizures." *People v Frohriep*, 247 Mich App 692, 699; 637 NW2d 562 (2001); see US Const, Am IV; Const 1963, art 1, § 11. A search occurs if the government intrudes upon an area where a person has a "reasonable expectation of privacy." *United States v Jones*, 565 US 400, 406; 132 S Ct 945; 181 L Ed 2d 911 (2012) (citation and quotation marks omitted); see also *People v Whalen*, 390 Mich 672, 677; 213 NW2d 116 (1973) ("Simply put, if an individual has a reasonable expectation of privacy in the area searched, or the materials seized, a search has been conducted."). "The lawfulness of a search . . . depends on its reasonableness." *People v Beuschlein*, 245 Mich App 744, 749; 630 NW2d 921 (2001). As a general rule, searches conducted with a warrant are reasonable, and warrantless searches are unreasonable. *Id.* "Searches conducted without a warrant are *per se* unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions." *People v Davis*, 442 Mich 1, 10; 497 NW2d 910 (1993) (citation and quotation marks omitted). "Each of these

exceptions, while not requiring a warrant, still requires reasonableness and probable cause." *People v Brzezinski*, 243 Mich App 431, 434; 622 NW2d 528 (2000). "Probable cause to search exists when facts and circumstances warrant a reasonably prudent person to believe that a crime has been committed and that the evidence sought will be found in a stated place." *Id*. at 433. The exception most pertinent for purposes of this appeal is the "plain view" exception.

Law enforcement can seize items within plain view if (1) "the evidence is obviously incriminatory" and (2) "the officer is lawfully in the position" where he or she views the obviously incriminatory evidence. *People v Galloway*, 259 Mich App 634, 639; 675 NW2d 883 (2003). Despite the plain view exception's name, physical view of incriminatory evidence is not required; rather, an officer must merely be able to perceive the incriminatory evidence with one of his or her senses. We allow officers to seize items that can be plainly smelled, *People v Kazmierczak*, 461 Mich 411, 421-422; 605 NW2d 667 (2000), or plainly felt, *People v Champion*, 452 Mich 92, 105; 549 NW2d 849 (1996). But, if the officer is not lawfully positioned when perceiving the incriminatory evidence, the plain view exception does not apply. *Galloway*, 259 Mich App at 639.

When an officer is positioned outside of a residence but perceives incriminatory evidence located inside of the residence, the legality of the officer's position depends on whether the officer invaded the residence's "curtilage." *United States v Dunn*, 480 US 294, 303-304; 107 S Ct 1134; 94 L Ed 2d 326 (1987). If an officer intrudes onto a person's curtilage, then his actions can constitute a search, but if the officer does not intrude onto a person's curtilage, and therefore remains outside of the property or in the property's "open fields," then the intrusion "is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment." *Id*. at 303-304 (citation and quotation marks omitted).

In distinguishing between a property's curtilage and open fields, the "primary inquiry is whether 'the area harbors the intimate activity associated with the sanctity of . . . [the] home and the privacies of life.' " *People v Powell*, 477 Mich 860, 861; 721 NW2d 180 (2006), quoting *Dunn*, 480 US at 300 (alteration in *Powell*). For " 'most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage . . . is a familiar one easily understood from our daily experience.' " *Dunn*, 480 US at 302, quoting *Oliver v United States*, 466 US 170, 182 n 12; 104 S Ct 1735; 80 L Ed 2d 214 (1984). When it is not, courts balance four factors to differentiate between curtilage and an open field: (a) the proximity of the area at issue to the home, (b) whether the area at issue is within an enclosure surrounding the home, (c) the nature of the uses to which the area at issue is put, and (d) the steps taken by the resident to protect the area at issue from the observation of others. *Dunn*, 480 US at 301-303; see also *Powell*, 477 Mich at 861 (applying the four-factor *Dunn* test).

If evidence is seized as the result of an unconstitutional search, the evidence may be suppressed under the "exclusionary rule," a " 'judicially created remedy designed to safeguard against future violations of Fourth Amendment rights through the rule's general deterrent effect.' " *People v Reese*, 281 Mich App 290, 295; 761 NW2d 405 (2008), quoting *Arizona v Evans*, 514 US 1, 10; 115 S Ct 1185; 131 L Ed 2d 34 (1995). For that reason, the exclusionary rule applies only in "those instances where its remedial objectives are thought most efficaciously served." *Reese*, 281 Mich App at 295. (citation and internal quotation marks omitted). That is, not all evidence is suppressed "simply because it would not have come to light but for the illegal

actions of the police." *Id*. (citation and internal quotation marks omitted). "[W]hether the evidence must be suppressed depends on whether the evidence was discovered through exploitation of that illegality" or by "sufficiently distinguishable" means. *Id*. at 295-296 (citation and internal quotation marks omitted).

## C. THE *FREDERICK* DECISION

In *Frederick*, 500 Mich at 542, the Michigan Supreme Court considered the constitutionality of two early morning searches of the defendants' homes. The prosecution argued that the police conduct was lawful as either a knock and talk or a consent search. *Id*. at 544. Addressing the prosecution's knock and talk argument, the Court explained that "[t]he proper scope of a knock and talk is determined by the 'implied license' that is granted to 'solicitors, hawkers, and peddlers of all kinds.' " *Id*., quoting *Florida v Jardines*, 569 US 1, 8; 133 S Ct 1409; 185 L Ed 2d 495 (2013). The *Frederick* Court concluded that the scope of the implied license to approach a house and knock is time-sensitive, and that there is no implied license to knock at someone's door in the middle of the night. *Id*. at 546. The *Frederick* Court, in reliance on the United States Supreme Court's reasoning in *Jardines*, reasoned that information-gathering combined with a trespass on Fourth-Amendment-protected property constituted a search triggering Fourth Amendment protections. *Id*. at 545-546. Based on this reasoning, the *Frederick* Court held that the officers' conduct in that case implicated the Fourth Amendment because (1) they exceeded the scope of their implied license and, therefore, were trespassing when they approached the defendants' homes at 4:00 a.m. and 5:30 a.m. and (2) they were seeking information about marijuana butter they believed the defendants possessed. *Id*. at 546-547. And because the police did not have warrants and no other exception to the warrant requirement applied, the Court held that the officers' approaches violated the Fourth Amendment. *Id*. at 548. The Court, nonetheless, remanded for the trial court to determine whether the subsequent consent was attenuated from the illegality. *Id*. at 549.

## III. APPLICATION

Defendant first challenges on appeal Sura's and Keller's actions: walking to the back of the residence during the knock and talk. Defendant argues that, because Sura and Keller violated his Fourth Amendment rights, evidence of the marijuana should be suppressed.

We previously held that Sura's and Keller's action did not lead to the recovery of any evidence, and, thus, the exclusionary rule was inapplicable. We reasoned as follows:

> While it is true that, after Sura and Pendergraff left the residence, Keller eventually detected the odor of marijuana, smelling marijuana from his patrol vehicle in front of the residence 45 or 50 minutes later, that had absolutely nothing to do with his walking to the back of defendant's residence allegedly in violation of defendant's constitutional rights. Stated differently, we simply cannot conclude that, but for Sura and Keller walking to the back of defendant's residence during the knock and talk, the marijuana would not have been obtained. [*Reese*, 281 Mich App] at 295. Rather, the marijuana was ultimately uncovered by "sufficiently distinguishable" means and, therefore, need not be suppressed. *Id*. (citation and internal quotation marks omitted). [*Towne*, unpub op at 4.]

This determination in our original opinion involved the causal relationship between Sura's and Keller's actions and the discovery of evidence, which was not at issue in *Frederick*. The *Frederick* Court did not discuss the discovery of evidence through "sufficiently distinguishable" means. Thus, *Frederick* has no effect on this part of our opinion. Accordingly, for the reasons stated in our previous opinion, we conclude that Sura's and Keller's actions did not require suppression of the evidence.

Defendant's second challenge is whether Henderson's actions, i.e., observing defendant's house from the tree line, violated defendant's Fourth Amendment rights. Defendant's argument rests solely on his erroneous assumption that Henderson was in the curtilage of his residence, which, as will be explained, he was not. From the tree line, Henderson observed an "overwhelming" and "extensive" amount of smoke coming from the chimney that smelled like an "extremely excess amount of freshly burned marijuana," and he could see the living room "getting brighter and brighter" "from a fire." Based on this information, Henderson and Keller clearly had probable cause, *Brzezinski*, 243 Mich App at 433-434 and the issue we are faced with is whether the requisites for application of the plain view exception existed.

As stated, law enforcement may seize evidence that is in plain view if (1) "the evidence is obviously incriminatory" and (2) "the officer is lawfully in the position" where he or she views the obviously incriminatory evidence. *Galloway*, 259 Mich App at 639. At issue here is whether Henderson was "lawfully in the position" when he smelled the "overwhelming" and "extensive" amounts of marijuana smoke leaving the residence's chimney. The legality of Henderson's position depends on whether he was in the curtilage of defendant's residence. See *Dunn*, 480 US at 303-304. We previously concluded that Henderson was not in the curtilage of defendant's residence, reasoning as follows:

> The record includes quite a bit of detail about defendant's property. It reflects that his residence sits in the middle of a wooded five-acre parcel. The residence itself is not enclosed by any type of manmade boundary. Instead, natural trees, as well as a handful of planted trees, surround the residence. Thus, we find it helpful to balance the four factors set forth in *Dunn*: (1) the proximity of Henderson's location to the residence, (2) whether Henderson's location was within an enclosure surrounding the residence, (3) the nature of the uses to which Henderson's location is put, and (4) the steps taken by defendant to protect Henderson's location from observation by people passing by. 480 US at 301-303. Doing so, we conclude that Henderson did not invade the curtilage of defendant's residence.
>
> Henderson's preliminary examination testimony reflects that he walked along the south and east sides of defendant's residence. Defendant claimed to have planted trees for privacy purposes in or near these areas. While defendant and his wife also testified that their pool, deck, fire pit, and river were located somewhat near the path that Henderson may have taken or the location that he stood in, Henderson testified that a significant distance, between ten and 20 feet, existed between him and these manmade structures. Henderson further testified that he was 20 to 25 yards from the residence itself. While this distance may not have exceeded the distances discussed in other cases, see *Oliver*, 466 US at 182;

see also *Dunn*, 480 US at 301-303, there is no bright-line distance required. Henderson specifically testified that he was "right on the tree line," "almost in the forest," and next to 100-foot-tall trees. This is consistent with the circuit court's finding that the officers were "on the edge, outer edge of the property." While defendant's wife attempted to refute such a conclusion, the record is clear in that neither she nor defendant actually saw where Henderson was located. Furthermore, she essentially described Henderson as being "within feet" or near areas that she labeled as private, not actually in the private areas. *Powell*, 477 Mich at 861. Thus, her testimony also supports a conclusion that Henderson was in an open field, albeit perhaps somewhat near what may be considered curtilage. Furthermore, to the extent Henderson's testimony about his location was in conflict with defendant's or defendant's wife's, we defer to the circuit court's credibility determination resolving those conflicts. *People v Sexton (After Remand)*, 461 Mich 746, 752; 609 NW2d 822 (2000). Thus . . . we conclude that Henderson did not invade the curtilage of defendant's residence[.] [*Towne*, unpub op at 5-6.]

*Frederick* did not address the meaning or scope of curtilage, and, therefore, we find that it has no effect on our previous determination. Therefore, for the same reasons as provided in our previous opinion, we conclude that Henderson was not within the curtilage of defendant's residence.

However, it is clear that Henderson was trespassing on defendant's property when he smelled the marijuana. As explained in *Frederick*, information-gathering combined with a trespass on Fourth-Amendment-protected property constitutes a search triggering Fourth Amendment protections. *Frederick*, 500 Mich at 545-546. Because we conclude that Henderson was not trespassing *on Fourth-Amendment-protected property*, we hold that defendant's Fourth Amendment rights were not violated.

In reaching this conclusion, we find a footnote from *Frederick* instructive. In footnote three, after explaining that the United States Supreme Court in *Jardines* concluded that officers who used a trained police dog to explore curtilage around a home to find incriminating evidence had "trespassed on Fourth-Amendment-protected property,"[4] the *Frederick* Court provided as follows:

The *Jardines* Court distinguished between trespasses that implicate the Fourth Amendment and those that do not. For instance, police may trespass and search in open fields without violating the Fourth Amendment because "an open field . . . is not one of those protected areas enumerated in the Fourth Amendment." *Jones*, 565 US at 411; 132 S Ct 945; citing *Oliver v United States*, 466 US 170, 177; 104

---

[4] In *Jardines* and *Frederick*, it was clear that the officers were in the curtilage of the defendants' residences, so that issue was not addressed. The issue in both cases was whether the officers were trespassing or whether they were complying with the scope of the implied license to enter a person's property for limited purposes that all members of the public enjoy.

S Ct 1735; 80 L Ed 2d 214 (1984). But because the curtilage is part of the home, *Oliver*, 466 US at 180; 104 S Ct 1735, and homes are protected by the Fourth Amendment, trespassing on the curtilage implicates Fourth Amendment protections. [*Frederick*, 500 Mich at 236 n 3].

Although Henderson was trespassing on defendant's property, he was in the open fields outside of the curtilage of defendant's residence, and, therefore, defendant's Fourth Amendment rights were not implicated. See *id*. Accordingly, because we conclude that Henderson did not invade the curtilage of defendant's residence, the plain view exception applies, and defendant's Fourth Amendment rights were not violated.[5]

　　　　Affirmed.

/s/ Deborah A. Servitto
/s/ Michael F. Gadola
/s/ Colleen A. O'Brien

---

[5] Defendant also argues that his Fourth Amendment rights were violated because Henderson walked across his property's curtilage before taking up his position at the tree line. As previously stated, Henderson's preliminary examination testimony reflects that he walked along the south and east sides of defendant's residence. To the extent that Henderson may have traversed across the curtilage of defendant's home, we find the following excerpt from *Frederick* instructive:

> A police officer walking through a neighborhood who takes a shortcut across the corner of a homeowner's lawn has trespassed. Yet that officer has not violated the Fourth Amendment because, without some information-gathering, no search has occurred. [*Frederick*, 500 Mich at240.]

Based on this excerpt, it is clear that if Henderson invaded the curtilage of defendant's residence when walking to his position outside of the curtilage from where he smelled the marijuana, there was no information-gathering at that time. Therefore, defendant's Fourth Amendment rights were not implicated.